NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1576-17T3

DAVID F. CALABOTTA,

      Plaintiff-Appellant,

v.

PHIBRO ANIMAL HEALTH
CORPORATION, DEAN J.
WARRAS, and DANIEL A.
WELCH,

      Defendants-Respondents.

_____

APPROVED FOR PUBLICATION

June 27, 2019

APPELLATE DIVISION

Argued May 13, 2019 – Decided June 27, 2019

Before Judges Sabatino, Sumners and Mitterhoff.

On appeal from the Superior Court of New Jersey,
Law Division, Bergen County, Docket No. L-1979-17.

Kathryn Kristine Mc Clure and Mary Anne Sedey
(Sedey Harper Westhoff, PC) of the State of Missouri
bar, admitted pro hac vice, argued the cause for
appellant (Smith Eibeler, LLC, and Mary Anne Sedey,
attorneys; Kathryn K. Mc Clure and Mary Anne
Sedey, of counsel and on the briefs; John D. Lynn
(Sedey Harper Westhoff, PC) of the State of Missouri
bar, admitted pro hac vice, of counsel and on the
briefs).

Martin Warren Aron argued the cause for respondents
(Jackson Lewis PC, attorneys; Martin Warren Aron, of

counsel and on the briefs; Mary L. Moore and Katerina Rose Mantell, on the briefs).

James Edward Burden argued the cause for amicus curiae NELA-NJ (Smith Mullin, PC, attorneys; James Edward Burden, on the brief).

James Patrick Flynn argued the cause for amicus curiae ANJMA (Epstein Becker & Green PC, attorneys; James Patrick Flynn, of counsel and on the brief; David Wayne Garland, on the brief).

James R. Michael, Deputy Attorney General, argued the cause for amicus curiae the Attorney General of New Jersey (Gurbir S. Grewal, Attorney General, attorney; Jason Wade Rockwell, Assistant Attorney General, of counsel; James R. Michael, on the brief).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

This lawsuit is brought by an Illinois resident against his New Jersey-based former employer. Plaintiff alleges the company wrongfully denied him a promotion to a position in New Jersey and thereafter wrongfully terminated him from his job with its subsidiary in Illinois.

Plaintiff claims the company engaged in "associational" discrimination against him, in violation of the New Jersey Law Against Discrimination ("NJLAD"), based on the fact that his wife was then terminally ill with cancer. The company maintains it treated plaintiff fairly, that he never applied for the

promotion, and that it justifiably discharged him for engaging in inappropriate conduct at a trade show.

The appeal raises two important and novel questions of law.

First, under principles of statutory construction, can the NJLAD protect nonresident workers and job applicants, despite the fact that the statute's preamble refers to "inhabitants" of this state?

Second, even if the NJLAD can extend to certain out-of-state plaintiffs, do choice-of-law principles weigh in favor of applying the law of Illinois instead to plaintiff's respective failure-to-promote and wrongful discharge claims?

The trial court concluded that Illinois law, rather than the NJLAD, must apply to plaintiff's claims of discrimination because he lived in Illinois and worked for defendants' subsidiary in Illinois. Given that Illinois law has yet to recognize a cause of action for associational discrimination, the court granted defendants' motion to dismiss plaintiff's claims with prejudice.

For the reasons that follow, we conclude that the NJLAD, notwithstanding the solitary reference to "inhabitants" in its preamble, can extend in appropriate circumstances to plaintiffs who reside or work outside of this state. However, whether the NJLAD applies to a particular nonresident's claims turns upon a weighing of the multiple choice-of-law factors set forth in

the Restatement (Second) of Conflicts of Laws (Am. Law Inst. 1971) (the "Second Restatement"), as adopted and construed by the New Jersey Supreme Court.

We hold that New Jersey law, and specifically the NJLAD's ban against associational discrimination, applies to defendants' alleged failure to give plaintiff fair consideration for a promotion to a position in New Jersey. The Second Restatement factors strongly weigh in favor of applying New Jersey law, not Illinois law, to this failure-to-promote claim. We therefore reverse the trial court's dismissal of that discrete claim.

As to plaintiff's wrongful discharge claim, we vacate its dismissal and remand the choice-of-law issue pertaining to that claim to the trial court for further analysis. We do so to enable the further development of critical facts bearing on the Second Restatement factors. Among other things, the record needs to be developed more fully and definitively concerning such things as: the location(s) of the person(s) within the company who took part in the decision to terminate plaintiff; the sole or dominant place, if any, that the decision was made; and the location(s) of plaintiff's conduct that precipitated his discharge. After those and other facts pertinent to the choice-of-law analysis are more fully developed, the trial court shall reassess which state has

the "most significant relationship" overall to plaintiff's wrongful discharge claim.

## I.

We glean the following facts and allegations from plaintiff's complaint and related pleadings, mindful that discovery has not yet been conducted and credibility determinations have not been made.

## A.

### Plaintiff's Work in Illinois for Phibro's Subsidiary

Defendant Phibro Animal Health Corporation ("Phibro"), a company headquartered in Teaneck, New Jersey, develops and sells animal food additives. Prince Agri Products Incorporated ("Prince Agri"), a subsidiary of Phibro, handles marketing, product management, research, development, and technical support. Prince Agri's office is located in Quincy, Illinois, where plaintiff resided at all times relevant to this case.

In 2008, Phibro hired plaintiff to serve as a Vice President of Marketing and Technology Deployment at Prince Agri's office. He worked in that position at Prince Agri in Illinois until his termination in 2016.

When plaintiff was hired, he signed three employment-related form agreements: a Noncompetition and Nonsolicitation Agreement, an Employee Invention Agreement, and a Confidentiality and Nondisclosure Agreement.

A-1576-17T3

All three agreements contained the following provision:

> THIS AGREEMENT WILL BE GOVERNED BY THE LAWS OF THE STATE OF NEW JERSEY WITHOUT REGARD FOR CONFLICTS OF LAW PRINCIPLES.   I EXPRESSLY CONSENT TO VENUE IN, AND THE PERSONAL JURISDICTION OF, THE STATE AND FEDERAL COURTS LOCATED IN NEW JERSEY FOR ANY LAWSUIT ARISING FROM OR RELATING TO THIS AGREEMENT.
>
> [(Emphasis added).]

Each agreement further stated:  "This Agreement does not alter the status of my employment as an at-will employee of [Phibro]."

Defendant Dean J. Warras, the President of Prince Agri, was plaintiff's direct supervisor.  Defendant Daniel A. Welch worked as Phibro's Senior Vice President of Human Resources.

Plaintiff maintains that Warras's and Welch's offices were located at Phibro's headquarters in Teaneck.  However, in connection with defendants' motion to dismiss the complaint, Warras certified that his own employment was based out of Prince Agri's office in Illinois, the state where Warras maintained a primary residence until approximately August 2016.

While at Prince Agri, plaintiff supervised a team of approximately forty employees who managed existing product portfolios, identified new products, conducted research on product use and development, and provided customer

and technical support.   According to plaintiff, he consistently received excellent annual performance reviews.   Among other accolades, the reviews reportedly stated that plaintiff worked "extremely hard," did an "excellent job," "significantly strengthened" his team over the years, and generated "new credibility and cache in the industry and academic community" for Phibro's products.   According to plaintiff, Phibro never placed him on any type of "Performance Management Plan" or "formally counseled [him] for performance or conduct issues."

B.

Disabling Health Issues of Plaintiff's Wife

Plaintiff's wife, Beth Calabotta, was diagnosed with breast cancer in 2008.  Following a period of remission, Beth's breast cancer recurred in 2014 and spread to other parts of her body.

Plaintiff contends he openly discussed Beth's health issues and prognosis with his co-workers and supervisors.  According to plaintiff, between 2014 and 2016 Warras periodically asked him questions about Beth's medical condition. Plaintiff believed that Warras shared the information about his wife's condition with Welch.  Additionally, in May and June 2016, the Quincy Herald-Whig and the Wall Street Journal featured Beth in prominent news stories that

7

discussed her terminal illness.[1]

## C.

### Company Reorganization and the New Jersey Position

In June 2016, Warras informed plaintiff that Phibro was reorganizing its operations and his responsibilities would be reduced significantly. Under the reorganization, plaintiff would no longer be responsible for marketing and project management, and ten to fifteen people would be cut from his staff. Moreover, plaintiff's title would change to Vice President, Research and Technical Support.

Warras told plaintiff that Phibro had created a new position based at Phibro's headquarters in New Jersey for a Senior Vice President of Marketing and Product Management. According to plaintiff, he inquired about who would be considered for the new position, and Warras responded that an independent recruiting firm would begin interviewing candidates "in the very near future." When plaintiff asked whether he would be considered for the new position, Warras allegedly replied, "I did not think that you would be interested. The job is in New Jersey and with Beth's situation and all . . . ."

Plaintiff claims he informed Warras and Welch on multiple occasions

---

[1] Beth died in March 2017, about eight months after plaintiff was terminated.

between June and July 2016 that he "should get serious consideration" for the new Senior Vice President position, given his marketing and product management experience at Prince Agri. At one point, Welch allegedly responded, "I don't know if that is going to happen." Plaintiff requested from Warras the job description for the new position. According to plaintiff, Warras assured him that he would get a copy of it. Warras also allegedly promised to talk to Phibro's senior managers about plaintiff's interest in the post.

Despite these alleged assurances, plaintiff was not interviewed for the new position and was not provided with the job description. In early July 2016, plaintiff learned that the recruiting firm had interviewed other candidates for the position. Plaintiff did not receive the promotion.

D.

The July 2016 National Meeting and Plaintiff's Subsequent Discharge

Between July 19 and July 23, 2016, plaintiff and several members of his team attended a national meeting of the American Dairy Science Association ("ADSA").[2]

On July 22, 2016, Welch called plaintiff to discuss a "serious problem" that had arisen at the ADSA meeting during a presentation made by a member

---

[2] The present record does not reveal in which state the ADSA meeting was held.

of plaintiff's staff and how plaintiff had handled the situation. The details of this incident are not fully explained in the complaint. At the end of their phone conversation, Welch suspended plaintiff with pay, "pending further investigation." Plaintiff claims that, despite his request for details, Welch never told him what accusations were being investigated.

On or about August 19, 2016, plaintiff met with Warras and Welch. They told him that they had "corroborated the allegations" against him. The complaint does not state where this meeting took place. Plaintiff again asked what the allegations were, but he claims he was not given an answer. He asserts he told Warras and Welch that, "he still believed he handled the situation [at the ADSA meeting] appropriately." They disagreed. Ultimately, Welch handed plaintiff a draft Separation Agreement and terminated his employment.

Plaintiff did not sign the Separation Agreement, which proposed that he give up his right to sue for claims "arising from or in any way connected with" his employment and termination, in exchange for $117,000 in severance pay. Paragraph 10 of the unsigned Separation Agreement stated that it "shall be interpreted for all purposes consistent with the laws of the State of New Jersey."

A-1576-17T3

Plaintiff maintains that the deliberations among Warras, Welch, and other senior executives culminating in their decision not to consider him for the promotional position, and their subsequent decision to terminate him, all occurred at Phibro's headquarters in New Jersey. Defendants, however, have not acknowledged that these decisions and communications were made in or confined to New Jersey.

According to the representations of counsel at the appellate oral argument, plaintiff applied for and obtained unemployment compensation from Illinois state authorities following his discharge. The present record does not reveal whether plaintiff's unemployment benefits application mentioned his contention that he was fired for discriminatory reasons.

## II.

### A.

### Plaintiff's Complaint

In March 2017, plaintiff filed a complaint in the Law Division against Phibro, Warras, and Welch. Count one alleges that defendants discriminated against him in violation of the NJLAD "on account of his association with a person with a disability" on two separate occasions: (1) when they refused to consider him for a promotion in New Jersey, and (2) when they subsequently terminated his employment. Counts two and three allege that defendants

Warras and Welch aided and abetted Phibro in violating the NJLAD. Plaintiff seeks compensatory damages, punitive damages, and statutory attorney fees.[3]

B.

The Dismissal of the Complaint and Denial of Reconsideration

Defendants moved to dismiss the complaint under Rule 4:6-2(e). They argued that, even accepting plaintiff's factual allegations as true, plaintiff has no viable cause of action under the NJLAD as an Illinois resident who worked for the company's subsidiary in Illinois.

On September 1, 2017, the trial court dismissed the complaint with prejudice, holding that "[t]he NJLAD does not apply to employees whose employment is based outside of New Jersey." The motion judge relied largely on this court's opinion in Buccilli v. Timby, Brown & Timby, 283 N.J. Super. 6 (App. Div. 1995), in which we found that Pennsylvania law, rather than the NJLAD, governed a New Jersey resident's claims of discrimination by her Pennsylvania employer for whom she had worked in Pennsylvania.

---

[3] There is a related federal lawsuit pending. In June 2017, plaintiff filed a Notice of Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), a claim which factually mirrored his NJLAD complaint. In July 2017, the EEOC granted him the right to sue under federal law. Plaintiff thereafter sued defendants in the United States District Court for the Central District of Illinois, asserting claims against them exclusively under federal law. That federal lawsuit is stayed, pending the resolution of this appeal.

Plaintiff moved for reconsideration. He presented to the court, for the first time, the three employment agreements he signed in 2008 and the unsigned Separation Agreement, all of which stated that any lawsuits arising out of those documents would be governed by New Jersey law. Defendants argued these employment agreements pertained only to discrete subjects and were not applicable to plaintiff's present discrimination claims.

On October 27, 2017, the trial court denied plaintiff's motion for reconsideration, concluding that the proffered agreements did not require the application of New Jersey law to his claims in this case.

Plaintiff's present appeal ensued.

C.

The Amici on Appeal

After the appeal was filed, the National Employment Lawyers Association of New Jersey ("NELA-NJ"), a statewide organization of attorneys who solely or primarily represent persons in employment-related matters, sought and was granted leave to appear in this appeal as amicus curiae. We thereafter invited the Attorney General to appear as amicus curiae to address the novel legal issues of statutory construction and choice-of-law presented. The Attorney General accepted the invitation and filed an amicus brief. In addition, we likewise granted the Academy of New Jersey Management

Attorneys, Inc. ("ANJMA"), an organization of New Jersey lawyers who have long represented employers in labor and employment matters, leave to appear as amicus curiae.[4]

Plaintiff and amicus NELA-NJ argue the trial court should have applied the NJLAD to both his failure-to-promote and wrongful termination claims. Defendants and amicus ANJMA counter that the court correctly applied Illinois law to both claims.

The Attorney General presents a more nuanced position. The Attorney General asserts that the NJLAD clearly should apply to plaintiff's failure-to-promote claim, but that the present record is inadequate to resolve whether the Second Restatement factors call for New Jersey or Illinois law to apply to his separate wrongful termination claim.

### III.

The pivotal question posed in this appeal is whether New Jersey law (including specifically the NJLAD) or Illinois law applies to each of this Illinois resident's claims against a New Jersey-based parent company and its officials. To answer this question, we must consider both the intended scope

---

[4] We express our appreciation for the helpful participation of all three amici in this case of first impression.

of the NJLAD as well as choice-of-law principles adopted by the New Jersey Supreme Court, including relevant portions of the Second Restatement.

## A.

### De Novo Review

In evaluating the trial court's decision declining to apply New Jersey law to either of plaintiff's claims, we apply a de novo scope of review. "Choice-of-law determinations present legal questions, which are subjected to de novo review." Fairfax Fin. Holdings Ltd. v. S.A.C. Capital Mgmt., LLC, 450 N.J. Super. 1, 33 (App. Div. 2017).

In addition, appellate review of an order dismissing a complaint for failure to state a claim under Rule 4:6-2(e) is conducted pursuant to a plenary scope of review, with no deference owed to the trial court's legal conclusions. Rezem Family Assocs., LP v. Borough of Millstone, 423 N.J. Super. 103, 114 (App. Div. 2011). We proceed with our analysis guided by these appellate review standards.

## B.

### General Choice-of-Law Principles

Several well-established principles of choice of law frame our discussion.

To begin with, "When New Jersey is the forum state, its choice-of-law rules control." Fairfax, 450 N.J. Super. at 34. "[O]ur choice-of-law jurisprudence has striven to structure rules that will lead to predictable and uniform results that are fair and just and that will meet the reasonable expectations of the parties." McCarrell v. Hoffmann-La Roche, Inc., 227 N.J. 569, 573 (2017). We may decide choice-of-law questions on an "issue-by-issue" basis. Fairfax, 450 N.J. Super. at 34. See also Ginsberg ex rel. Ginsberg v. Quest Diagnostics, Inc., 441 N.J. Super. 198, 230 (App. Div. 2015) (recognizing this principle and also holding that choice-of-law issues at times may be decided on a defendant-by-defendant basis).

"Procedurally, the first step is to determine whether an actual conflict exists" through an examination of "the substance of the potentially applicable laws to determine whether 'there is a distinction' between them." P.V. ex rel. T.V. v. Camp Jaycee, 197 N.J. 132, 143 (2008) (quoting Lebegern v. Forman, 471 F.3d 424, 430 (3d Cir. 2006)). "A conflict of law arises when the application of one or another state's law may alter the outcome of the case . . . or when the law of one interested state is 'offensive or repugnant' to the public policy of the other." In re Accutane Litig., 235 N.J. 229, 254 (2018) (quoting Cont'l Ins. Co. v. Honeywell Int'l, Inc., 234 N.J. 23, 46 (2018)). See also Fairfax, 450 N.J. Super. at 42-43 ("A conflict arises . . . when one state

16

provides a cause of action but the other does not . . . .").  If no such conflict exists, "then 'there is no choice-of-law issue to be resolved,' Camp Jaycee, 197 N.J. at 143, and the forum state applies its own law, McCarrell, 227 N.J. at 584."  In re Accutane, 235 N.J. at 254.

If an actual conflict exists, then New Jersey courts in cases involving claims of tortious conduct[5] apply the choice-of-law principles described in the Second Restatement, particularly sections 6, 145, and 146.  See In re Accutane, 235 N.J. at 257-63; Camp Jaycee, 197 N.J. at 135-36.

Section 6(1) of the Second Restatement begins with the threshold principle that "[a] court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law."  Restatement (Second) § 6(1).  A choice-of-law analysis "is preempted when our Legislature has determined that New Jersey public policy requires the application of our substantive law whenever our courts have jurisdiction over the kind of claim at issue, regardless of the interest of another state."  Fairfax, 450 N.J. Super. at

---

[5]  The parties and the amici have fashioned their arguments on a premise that plaintiff's claims of discrimination in this case are most akin to claims of tortious conduct rather than claims of breach of contract.  See Montells v. Haynes, 133 N.J. 282, 291 (1993) (treating claims of discrimination under the NJLAD as most akin to torts and thus subject to New Jersey's two-year statute of limitations).  Cf. Second Restatement § 186 (expressing the applicable choice-of-law principles for breach of contract claims).  We accept that premise for purposes of our analysis.

43.

Where the legislative intent cannot be ascertained, either through "an explicit statutory directive" or "by a process of interpretation and construction," id. at 47, our courts apply the most-significant-relationship test in tort matters to resolve choice-of-law questions.  See In re Accutane, 235 N.J. at 257-63; Camp Jaycee, 197 N.J. at 135-36.  "The [Second] Restatement's most-significant-relationship test embodies all the elements of [the New Jersey Supreme] Court's former governmental-interest test and adds 'a series of other factors deemed worthy of consideration.'"  In re Accutane, 235 N.J. at 257 (quoting Camp Jaycee, 197 N.J. at 142 n.4).

To determine whether New Jersey has the most significant relationship, we consider sections 145 and 146, which provide the general principles for tort actions, as well as section 6, which outlines universal principles for choice-of-law issues.  In re Accutane, 235 N.J. at 260.

Choice-of-law "analysis begins with section 146 and the presumption [in tort-based cases] that the law of the state where the injury occurs applies."  Id. at 259.  However, that "presumption may be overcome if 'some other state has a more significant relationship with the parties . . .  based on an assessment of each state's contacts' viewed through the prism of section 145 . . . and section 6."  Ibid. (quoting McCarrell, 227 N.J. at 590).

Specifically, section 146 provides:

> In an action for a personal injury,[6] the local law of the state <u>where the injury occurred</u> determines the rights and liabilities of the parties, <u>unless</u>, with respect to the particular issue, <u>some other state has a more significant relationship</u> under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.
>
> [<u>Second Restatement</u> § 146 (emphasis added).]

Section 6 provides a list of seven, non-exclusive general factors to be considered when deciding which state's law applies:

> (a) the needs of the interstate and international systems,
>
> (b) the relevant policies of the forum,
>
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>
> (d) the protection of justified expectations,
>
> (e) the basic policies underlying the particular field of law,
>
> (f) certainty, predictability and uniformity of result, and

---

[6] We consider plaintiff's claims to encompass allegations of "personal injury," since his complaint seeks damages for, among other things, pain and suffering and emotional distress. None of the counsel before us have argued to the contrary.

(g)  ease in the determination and application of the law to be applied.

[Second Restatement § 6(2).]

"The factor that deserves the greatest emphasis in a particular case is that which furthers the most relevant policy interest . . . ."  Fairfax, 450 N.J. Super. at 48.  Notably, "[w]hen 'the purposes sought to be achieved by a local statute . . . would be furthered by its application to out-of-state facts, . . . this is a weighty reason why such application should be made.'"  Ibid. (quoting Second Restatement § 6(2) cmt. e).  "In general, it is fitting that the state whose interests are most deeply affected should have its local law applied."  Second Restatement § 6(2) cmt. f.

Section 145, meanwhile, requires consideration of "certain contacts" to determine which state "has the most significant relationship to the occurrence and the parties under the principles stated in § 6."  Second Restatement § 145(1), (2).  Those contacts include:

(a)  the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and

(d)  the place where the relationship, if any, between the parties is centered.

20

[Second Restatement § 145(2).]

"The contacts analysis is 'not merely quantitative,'" as "[i]ts purpose is to assess the contacts in terms of the guiding touchstones of the Second Restatement's section 6." Fairfax, 450 N.J. Super. at 51 (quoting Camp Jaycee, 197 N.J. at 147). Moreover, "the contacts 'are to be evaluated according to their relative importance with respect to the particular issue.'" Fairfax, 450 N.J. Super. at 51 (quoting Second Restatement § 145).[7]

This legal framework first requires us to consider whether an actual conflict exists between the potentially applicable New Jersey and Illinois laws. If such a conflict exists, then section 6 logically entails a two-step assessment. First, we must consider whether the Legislature intended for the NJLAD to encompass plaintiff's claims as alleged in the complaint. If so, then, we must consider whether the Legislature also intended the terms of the NJLAD to override conflicting Illinois law as to those claims. If the legislative intent is unclear, then further analysis is warranted to resolve the choice-of-law question, using the factors in section 6(2) and the most-significant-relationship test expressed in section 145.

---

[7] The recently adopted Restatement of the Law, Employment Law (Am. Law Inst. 2015), does not provide any guidance on choice-of-law issues arising in the employment context.

## IV.

### A.

Apparent Conflict Between the States' Laws

As a starting point, we proceed with a premise that there is an actual conflict between New Jersey law and Illinois law germane to plaintiff's claims of "associational" discriminatory treatment by his employer.

The NJLAD prohibits "any unlawful discrimination against any person because such person is or has been at any time disabled . . . unless the nature and extent of the disability reasonably precludes the performance of the particular employment."  N.J.S.A. 10:5-4.1.  Although the NJLAD does not expressly set forth a cause of action for discrimination based upon a plaintiff's association with a member of a protected class, case law has recognized the viability of such an associational claim under the statute.

This court has held "where the plaintiff is wrongfully discharged for associating with a member of a protected group [under the NJLAD], that is the functional equivalent of being a member of the protected group."  O'Lone v. N.J. Dep't of Corr., 313 N.J. Super. 249, 255 (App. Div. 1998).  Accordingly, a plaintiff closely associated with such a disabled person or other member of a protected class can serve as the "functional equivalent" of an "aggrieved person" under section 5-13 of the NJLAD.  See Downs v. U.S. Pipe & Foundry

Co., 441 F. Supp. 2d 661, 662-65 (D.N.J. 2006) (similarly recognizing an employee's protection under the NJLAD from being discriminated against because of his spouse's disabling mental health disorders that caused him to miss time from work on short notice). [8]

In comparison, Illinois law has yet to recognize a cause of action for associational discrimination. Nothing in that state's general antidiscrimination provision, the Illinois Human Rights Act, 775 Ill. Comp. Stat. 5/2-101 to -107 (2019), expresses such associational protection, although plaintiff reserves the right to argue such protection is implied.

Hence, we shall conduct our choice-of-law analysis with an assumption – which the trial court shared – that there is an actual conflict between New Jersey law and Illinois law as to the viability of plaintiff's associational discrimination claims.[9]

---

[8] The New Jersey Supreme Court has not repudiated this theory of associational discrimination. Given the Court's historically broad interpretation of the NJLAD, we have no reason to think the Court disapproves of such a cause of action.

[9] Although they did not brief it, at oral argument on appeal, counsel also pointed out that New Jersey law differs from Illinois law with respect to the need to exhaust administrative remedies and the availability of punitive damages. See 775 Ill. Comp. Stat. 5/8–111(D); 775 Ill. Comp. Stat. 5/8B-104. But see 775 Ill. Comp. Stat. 5/10-102(C). We need not resolve here those choice-of-law issues, which were not addressed by the trial court.

## B.

### Section 6 of the Second Restatement

We next must consider, under section 6(1) of the Second Restatement, whether our State Legislature has issued "a statutory directive" that calls for the application of the NJLAD to the facts of this case involving a nonresident plaintiff who worked for a New Jersey parent company outside of New Jersey.

This question essentially involves two components. First, did our Legislature intend the NJLAD to be broad enough to extend to certain nonresidents such as plaintiff who seek employment in New Jersey? Second, if so, has the Legislature issued through the NJLAD a choice-of-law "directive" that compels our courts to apply New Jersey law to such plaintiffs and their employers, rather than conflicting out-of-state laws?

### 1.

### Legislative Intent as to the NJLAD's Breadth

As to the first query, we are persuaded that our Legislature has expressed an intention to allow certain nonresident plaintiffs to receive the benefits and protections of the NJLAD. Such an intention about the NJLAD's breadth may be gleaned from both the words of the statute and the expansive policies that underpin it.

"Any fair analysis" of the scope of a statute "begin[s] . . . by looking at the statute's plain language, which is generally the best indicator of the Legislature's intent." Lippman v. Ethicon, Inc., 222 N.J. 362, 380-81 (2015) (quoting Donelson v. DuPont Chambers Works, 206 N.J. 243, 256 (2011)). "If the plain language leads to a clear and unambiguous result, then [the] interpretive process is over." Richardson v. Bd. of Trs. Police & Firemen's Ret. Sys., 192 N.J. 189, 195 (2007). See also State v. Harper, 229 N.J. 228, 237 (2017). "However, if a statute's plain language is ambiguous or subject to multiple interpretations," then courts look to extrinsic evidence to inform their analysis, "including legislative history." Parsons v. Mullica Twp. Bd. of Educ., 226 N.J. 297, 308 (2016).

Because this case concerns claims under the NJLAD, "special rules of interpretation also apply." Nini v. Mercer Cty. Cmty. Coll., 202 N.J. 98, 108 (2010). "When confronted with any interpretive question" pertaining to the NJLAD, our courts "must recognize" the NJLAD's pronouncement of its broad public policy goals. Smith v. Millville Rescue Squad, 225 N.J. 373, 390 (2016).

The NJLAD is "remedial legislation, intended 'to eradicate the cancer of discrimination[,]' protect employees, and deter employers from engaging in discriminatory practices." Acevedo v. Flightsafety Int'l, Inc., 449 N.J. Super.

25

185, 190 (App. Div. 2017) (quoting <u>Jackson v. Concord Co.</u>, 54 N.J. 113, 124 (1969)).  It is well established that the NJLAD should be "liberally construed 'in order to advance its beneficial purposes.'"  <u>Smith</u>, 225 N.J. at 390 (quoting <u>Nini</u>, 202 N.J. at 115).  "[T]he more broadly [the NJLAD] is applied, the greater its antidiscriminatory impact."  <u>Nini</u>, 202 N.J. at 115.  Because workplace discrimination is "still a pervasive problem in the modern workplace, even 'novel arguments' advanced by victims . . . 'require our utmost care and attention.'"  <u>Smith</u>, 225 N.J. at 390 (quoting <u>Quinlan v. Curtiss-Wright Corp.</u>, 204 N.J. 239, 260 (2010)).

The NJLAD's broad and strong language provides ample support for plaintiff's position that, subject to other choice-of-law factors, he may bring claims under the statute, despite the fact that he lived and worked for defendants out-of-state.  N.J.S.A. 10:5-4 states that, "[a]ll persons shall have the opportunity to obtain employment . . . without discrimination . . . .  This opportunity is recognized and declared to be a civil right." (Emphasis added).  Moreover, N.J.S.A. 10:5-5(a) defines the term "person" as "one or more individuals, partnerships, associations, organizations, labor organizations, corporations, legal representatives, trustees, trustees in bankruptcy, receivers, and fiduciaries."  The statute's plain language notably does not limit the definition of "person" to New Jersey residents or employees.

Furthermore, N.J.S.A. 10:5-5(e) declares that the definition of the term "employer" broadly includes "all persons as defined in subsection (a) of the section unless otherwise specifically exempt." (Emphasis added). Equally broadly, N.J.S.A. 10:5-12(a) prohibits the discriminatory refusal "to hire or employ" and the discriminatory discharge of "any individual" on the basis of that individual's protected characteristics, which include race, gender, religion, and disability, among others. (Emphasis added). The statute does not restrict the definition of "any individual" to New Jersey residents or employees. See also N.J.S.A. 10:5-13 (permitting "[a]ny person claiming to be aggrieved by an unlawful employment practice or unlawful discrimination" to file a complaint with the Division of Civil Rights, or to bring a lawsuit in the Superior Court).

a.

That said, defendants point out that the NJLAD's preamble contains more restrictive language that creates a potential interpretive ambiguity about the statute's coverage. They assert this ambiguity undercuts plaintiff's interpretation.

The preamble, found at N.J.S.A. 10:5-3, states in relevant part:

> The Legislature finds and declares that practices of discrimination against any of its inhabitants, because of . . . disability . . . are matters of concern to the government of the State, and that such discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces

27

the institutions and foundations of a free democratic State . . . .

The Legislature further declares its opposition to such practices of discrimination when directed against any person . . . in order that the economic prosperity and general <u>welfare of the inhabitants of the State</u> may be protected and ensured.

The Legislature further finds that because of discrimination, <u>people</u> suffer personal hardships, and the State suffers a grievous harm.

[(Emphasis added).]

We recognize "[a] court may turn to a statute's preamble as an aid in determining legislative intent." <u>DiProspero v. Penn</u>, 183 N.J. 477, 496 (2005). A preamble "should be read in harmony with the statute that it introduces, whenever possible." <u>Ibid.</u> However, "[t]o the extent that the preamble is at variance with the clear and unambiguous language of the statute, the preamble must give way." <u>Id.</u> at 497.

As underscored above, the first and second paragraphs of the NJLAD's preamble make reference to "inhabitants" of this State, when explaining the Legislature's intent in enacting the NJLAD. Although the NJLAD does not define the term "inhabitants," a more general statute, N.J.S.A. 1:1-2, directs us to construe the word "population . . . as synonymous with 'inhabitants.'" That Title 1 provision, in turn, defines the term "population" as "the population as shown by the latest Federal census effective within this State." N.J.S.A. 1:1-2.

A-1576-17T3

Thus, in enacting the NJLAD, the Legislature aimed to <u>at least</u> protect New Jersey inhabitants, i.e., residents, from the harmful effects of discrimination.

Nonetheless, the preamble does not state that the NJLAD was intended to protect only New Jersey residents. Even within the preamble itself, the word "inhabitants" is not consistently used throughout the rest of the preamble, let alone the full statute. For instance, the second paragraph of the preamble declares the Legislature's "opposition to such practices of discrimination when directed against <u>any person</u>," not solely against inhabitants. N.J.S.A. 10:5-3 (emphasis added). The third paragraph further declares that because of discrimination, "people" – not just inhabitants – "suffer personal hardships." <u>Ibid.</u>

As we have noted, the word "inhabitant" does not appear at all in the operative provisions of the statute outside of the preamble. Given that context, "the preamble must give way," <u>DiProspero</u>, 183 N.J. at 497, and it does not cloud our reading of the unambiguous and broader operative provisions of the NJLAD.

We recently addressed a similar issue of statutory interpretation in <u>Scheeler v. Atlantic City Mun. Joint Ins. Fund</u>, 454 N.J. Super. 621, 624-25 (App. Div. 2018), a decision involving the Open Public Records Act ("OPRA"), N.J.S.A. 47:1A-1 to -13. There, we considered whether an out-of-

state resident had standing to file an OPRA request, or whether rights under OPRA were limited to "citizens" of New Jersey based upon language contained in OPRA's preamble.

We acknowledged in <u>Scheeler</u> that the Legislature's use of the term "citizens of this State" in the preamble of OPRA "arguably created an ambiguity[,]" about its breadth. <u>Id.</u> at 627. However, we determined that the ambiguity was "easily resolved" by reading the statute "sensibly" and considering "the context in which the phrase 'citizens of this State' is used, the terms the Legislature used in the rest of OPRA, and . . . the statute's history and purpose." <u>Ibid.</u> We held that "[b]ecause the more specific provisions of OPRA refer to 'any person,' and because OPRA is to be construed broadly to achieve the Legislature's over-arching goal of making public records freely available, . . . the right to request records under OPRA is not limited to 'citizens' of New Jersey." <u>Ibid.</u> That same reasoning applies here.

More to the point, we stated in dicta in <u>Scheeler</u> that the NJLAD's use of the term "inhabitants" in its preamble "does not mean that the [NJ]LAD only protects New Jersey residents and allows discrimination against visitors from other states." <u>Id.</u> at 631 n.4. We noted that the NJLAD's "specific provisions addressing discrimination in housing, employment[,] and public accommodations prohibit discrimination against any 'person' or any

'individual.'" Ibid. (citing N.J.S.A. 10:5-4; N.J.S.A. 10:5-12). We reaffirm that observation here.

b.

Having carefully examined the NJLAD's text and extensive legislative history, we detect no expression of legislative intent to limit the statute's protections to job applicants who live in New Jersey, or to those employees who perform all of their employment functions in New Jersey. As a general matter, the Legislature has amended the NJLAD numerous times in order to expand its scope, to protect additional classes of people, and to allow more claims. See Rodriguez v. Raymours Furniture Co., 225 N.J. 343, 357-58 (2016) ("The Legislature's activity has been in one direction. It has acted only to strengthen the [NJ]LAD, adding more protections and for more classes of individuals."). And, again, it is well-established that the NJLAD must be construed liberally toward its overarching goal of eradicating discrimination. Quinlan, 204 N.J. at 259; Acevedo, 449 N.J. Super. at 190.

We therefore conclude that, despite the inclusion of the term "inhabitants" in the preamble of the NJLAD, the Legislature did not intend to confine the scope of the statute's protections solely to plaintiffs and claimants

who reside in this State.[10]

2.

<u>Is There Legislative Intent to Override Another State's Laws?</u>

The next related question under section 6(1) of the <u>Second Restatement</u> is whether the Legislature has clearly directed that our courts <u>must</u> apply the NJLAD to cases where choice-of-law issues arise because of conflicting laws of other states. On this point, we are unpersuaded by plaintiff and the NELA-NJ that the Legislature has imposed such a choice-of-law mandate.[11] Just

---

[10] By analogy, the Consumer Fraud Act ("CFA"), N.J.S.A. 56:8-1 to -210, and the Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1 to -14, have been interpreted to allow certain out-of-state plaintiffs to pursue claims against New Jersey defendants under those statutes. <u>See, e.g.</u>, <u>Real v. Radir Wheels, Inc.</u>, 198 N.J. 511, 527 (2009) (holding a Missouri resident who purchased car via an internet auction without ever visiting New Jersey could assert CFA claim against New Jersey-based seller); <u>Aguerre v. Schering-Plough</u>, 393 N.J. Super. 459, 475-76 (App. Div. 2007) (finding Argentinian-nationals successfully asserted CEPA claims against their New Jersey-based employers). <u>See also</u> <u>Feldman v. Hunterdon Radiological Assocs.</u>, 187 N.J. 228, 241 (2006) ("[C]ourts frequently compare CEPA to [NJ]LAD, applying the legal tests and frameworks developed under one to the other, 'because CEPA, like [the NJLAD], is a civil rights statute'" (quoting <u>Kolb v. Burns</u>, 320 N.J. Super. 467, 477 (App. Div. 1999))); <u>D'Agostino v. Johnson & Johnson, Inc.</u>, 133 N.J. 516, 533 (1993) (holding that a common-law whistleblower claim brought by a Swiss-national plaintiff against a New Jersey-based defendant employer was governed by New Jersey law because "New Jersey law regulates conduct in New Jersey.").

[11] Notably, the Attorney General has not joined in plaintiff's argument claiming a statutory choice-of-law "directive" within the meaning of section 6(1) of the <u>Second Restatement</u> is intended to override contrary laws of other

(continued)

32

A-1576-17T3

because a New Jersey statute <u>could</u> embrace certain claims by out-of-state parties does not necessarily mean that those New Jersey laws inexorably <u>must</u> override contrary laws from other jurisdictions.

A key purpose of our multi-factor choice-of-law jurisprudence, as embodied in the <u>Second Restatement</u>, is to promote interstate comity and due respect for the laws and interests of sister states, rather than automatically impose New Jersey law in some provincial or overly aggressive fashion. For example, our Supreme Court in <u>In re Accutane</u>, 235 N.J. at 254, recently ruled that the terms of the New Jersey Product Liability Act ("NJPLA") do not automatically apply to all plaintiffs from all jurisdictions who may be injured by products made in New Jersey but, instead, that the appropriate choice-of-law depends upon a balancing of <u>Second Restatement</u> factors under sections

---

(continued)
states. Although we are not bound to adopt the Attorney General's position, we give due deference to the Attorney General as the legal adviser to State Government, <u>see</u> N.J.S.A. 52:17A-4(e), and also because of the Attorney General's institutional role in enforcing the NJLAD and in overseeing the Division of Civil Rights, N.J.S.A. 10:5-8. <u>See</u> <u>Quarto v. Adams</u>, 395 N.J. Super. 502, 513 (App. Div. 2007) (recognizing the Attorney General's interpretation of a statute is entitled "to a degree of deference" because of his or her "special role as the sole legal adviser to most agencies of State Government").

6(2) and 145.[12]

We reject plaintiff's suggestion that the Legislature has mandated our courts to bypass a multi-factor analysis in this case. To do so would run counter to the philosophy of the most-significant-relationship test and the choice-of-law jurisprudence pronounced by the Court in recent years. In re Accutane, 235 N.J. at 254; McCarrell, 227 N.J. at 573. We do not construe the NJLAD to bulldoze over the conflicting laws of other states that also have a nexus to the case.

Moreover, the Legislature has shown that when it wishes to issue a "statutory directive" on choice-of-law, it knows how to do it. See, e.g., New Jersey Franchise Practices Act, N.J.S.A. 56:10-7.3(a)(2) (mandating that franchisors cannot require franchisees to waive their rights "otherwise available under the laws of this State"); Uniform Commercial Code, N.J.S.A. 12A:1-301(a), (b) (directing that the law of New Jersey generally shall apply to a transaction "bearing an appropriate relation to this State," unless the parties agree to the contrary). No comparable language dictating choice-of-law appears in the NJLAD. There is simply no "statutory directive" here qualifying under section 6(1).

---

[12] After conducting that detailed analysis, the Court concluded in In re Accutane that the NJPLA applied to all 532 cases before it involving plaintiffs from numerous states suing a New Jersey drug manufacturer. Id. at 265.

V.

Lacking a statutory directive, we now must consider how the <u>Second Restatement</u>'s balancing factors in sections 6(2), 145, and 146 apply to the choice-of-law analysis for the claims pleaded in this case. We conduct that analysis by separately considering plaintiff's failure-to-promote claim and then, in turn, his wrongful discharge claim.

A.

<u>The Failure-to-Promote Claim</u>

Plaintiff argues that, even though he is an Illinois resident who worked for defendants in Illinois, the law of New Jersey should govern his claim that Phibro and its agents discriminated against him by failing to consider him for the promotion to the new position. In particular, he emphasizes that the new position was in New Jersey, the company officials allegedly made the promotional decision in New Jersey, and the defendant company is based in New Jersey.

As a threshold matter, defendants contend that plaintiff never undertook any steps to apply for the New Jersey position, and accordingly his failure-to-promote claim is not viable. Plaintiff contends to the contrary that he repeatedly expressed interest in the post, and that defendants thwarted him from applying. We need not resolve that factual dispute here. The posture of

this case is on a motion to dismiss a claim on its face under Rule 4:6-2(e). As such, we must presume, for present purposes, that plaintiff's factual allegations pled in the complaint are true. Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 772 (1989). Consequently, we proceed with the choice-of-law analysis with a supposition that plaintiff did, in fact, pursue the promotion, without prejudice to defendants demonstrating otherwise in the litigation after discovery.

The trial court did not fully analyze the Second Restatement factors in its rulings. Instead, it chiefly relied on the choice-of-law aspects of this court's 1995 opinion in Buccilli, a case that preceded the Supreme Court's 2008 opinion in Camp Jaycee adopting the approach of sections 6 and 145 of the Second Restatement.

In Buccilli, the plaintiff was a New Jersey resident working as a paralegal for the defendant law firm in its Philadelphia office. Buccilli, 283 N.J. Super. at 9. The firm also maintained an office in Cherry Hill, New Jersey. Ibid. After the plaintiff was terminated, she filed an NJLAD claim in New Jersey Superior Court alleging sex discrimination. Id. at 9-10. The trial court dismissed her claim "on the ground that it could be decided only in a Pennsylvania court" under Pennsylvania law, not the NJLAD. Id. at 10, 13.

36

We reversed in <u>Buccilli</u>, holding that the plaintiff's claim could be adjudicated in our Superior Court, but under Pennsylvania law. <u>Id.</u> at 13-15. We agreed with the trial court that "[o]nly Pennsylvania, not New Jersey, substantive law governs" because the "[p]laintiff's employment began and ended in Pennsylvania. She worked exclusively in that state and the conduct which she alleges was unlawful occurred there." <u>Id.</u> at 10. Based on those facts, we held that "the damage claim of a New Jersey resident for her allegedly wrongful dismissal from out-of-state employment is governed by the law of the state in which she was employed." <u>Id.</u> at 10-11. We reasoned that "making the rights of each of several co-workers dependent on his or her state of residence would be an entirely unreasonable result" from the employer's perspective. <u>Id.</u> at 11-12.

Although we do not believe the choice-of-law outcome in <u>Buccilli</u> is inconsistent with the <u>Second Restatement</u> factors, the trial court's dispositive reliance on that case in the present matter was misplaced. The factual allegations before us, as pleaded in the complaint, are materially distinguishable from <u>Buccilli</u>.

Indeed, in several respects, the present facts are the converse of <u>Buccilli</u>. Here, plaintiff resides <u>outside</u> of this state, and the defendant company is based <u>in</u> New Jersey. Unlike Ms. Buccilli, plaintiff worked for the company in his

state of residence, but sought a promotion to a position in New Jersey. He contends the discriminatory conduct by defendants occurred in New Jersey, whereas in Buccilli the alleged discriminatory conduct took place in Pennsylvania.

Defendants and ANJMA focus upon passages in Buccilli in which we observed that Ms. Buccilli's "employment began and ended in Pennsylvania," that she "worked exclusively in that state," and that "the conduct she alleges was unlawful occurred there." Id. at 10. However, the defendants' business was located in Pennsylvania, and there was no nexus to New Jersey other than Ms. Buccilli's residency in this State. We continue to agree those circumstances correctly tipped the scales in Buccilli in favor of the application of Pennsylvania law to that particular plaintiff's claims.[13]

Even so, in the wake of the Supreme Court's subsequent precedent in Camp Jaycee and its adoption of the Second Restatement factors, Buccilli should not be misread to impose a bright-line choice-of-law principle that all employment discrimination claims must be governed by the law of the state where a plaintiff exclusively or principally worked. Although a plaintiff's

---

[13] Plaintiff, the NELA-NJ, and the Attorney General do not argue that we need to overrule or repudiate Buccilli in order to reverse the trial court's choice-of-law decision in this case.

place of work is surely an important consideration, it is not always dispositive. Other aspects of the case may at times override it.

A rigorous application of sections 6(2), 145, and 146 factors to plaintiff's failure-to-promote claim shows that New Jersey law, not Illinois law, must govern that particular claim. Most of those factors are heavily influenced by the fact that the new position sought by plaintiff and other potential applicants was going to be located in this state, where the defendant company Phibro is based.

For starters, we are persuaded that under section 6(2)(a), the "needs of the interstate . . . systems" are generally best served by applying the law of the state where a job opening will be filled. Indeed, that coincides with the expressed desire of defendants and the ANJMA to have uniformity in the law applicable to the same group of employees or prospective employees. If a job vacancy is in New Jersey, it would be unwieldy for an employer to have each applicant's quest for the post individually governed by the law of the state or country in which he or she presently happens to live. Instead, it makes sense to have all applicants treated under one set of state laws. The "needs" of the system favor such uniformity in a hiring context.

Turning to subsections (b) and (c), the policies and interests of this state and other jurisdictions are fairly accommodated by applying local law to an

employer's conduct in filling a job opening.  There is little reason to think that other jurisdictions would want their laws extended to hiring decisions made elsewhere, particularly if that meant, reciprocally, that employers in their own states would have to grapple with applying the laws of numerous other jurisdictions each time they filled a position that drew job-seekers from other places.

Next, subsection (d) concerns the "protection of justified expectations." Here, a person such as plaintiff seeking a job in New Jersey would reasonably expect the laws of New Jersey to govern the hiring and selection process.  So too would Phibro, as a New Jersey employer.  Indeed, although they do not literally cover plaintiff's claims, the agreements drafted by Phibro reciting that New Jersey law governs various other aspects of plaintiff's work relationship are at least evidence of such company expectations.

As for subsection (e), the "basic policies" underlying antidiscrimination laws favor applying the NJLAD to the hiring of workers who will be employed in this state.  The strong and expansive public policies of the NJLAD, which we have already discussed, would be weakened if each job applicant did not get the full benefit of those protections.

Further, the values of "certainty, predictability, and uniformity of result" under subsection (f) are logically advanced by having New Jersey

40

antidiscrimination laws apply to each applicant for a job located in New Jersey. So would the "ease" in determining and applying that single set of state laws, consistent with section 6(2)(e).

The enumerated factors of sections 145 and 146 of the Second Restatement for tort-based claims also point towards applying New Jersey law to plaintiff's failure-to-promote claim.

Regarding section 146, it is unclear where the "place of injury" occurred because discovery has not been conducted. We recognize that the "injury" to a disappointed job-seeker arguably is felt by each applicant in the place he or she resides, here being Illinois. Even so, the complaint alleges that the place where the discriminatory denial of the promotion occurred was New Jersey, although that locale is not conceded by defendants. Because the place of injury relating to this claim is not easily identified from the record, In re Accutane, 235 N.J. at 260, we must turn to section 145.

Under section 145(1), which cross references the factors in section 6 we have already discussed, New Jersey plainly has the most significant relationship to the failure-to-promote claim. The various "contacts" set forth in section 145(2)(a) through (d) weigh in favor of applying New Jersey law to this failure-to-promote claim.

Regarding section 145(2)(a), the place of plaintiff's injury is, as we have noted, debatable. In addition, under section 145(2)(b), the place of the defendants' alleged wrongful conduct is also presently unclear. The considerations of domicile, residency, nationality, place of incorporation, and place of business under section 145(2)(c) have mixed aspects. But the overall weight of those considerations manifestly tips in favor of New Jersey, the state of Phibro's business and where the new position was to be located. Moreover, under section 145(2)(d), New Jersey would be the place where the parties' future relationship would be "centered" upon filling the position.

All in all, the Second Restatement analysis under sections 6, 145, and 146 produces a logical and overarching nexus to New Jersey with respect to plaintiff's failure-to-promote claim. The trial court erred in ruling otherwise and applying Illinois law to that particular cause of action. We accordingly reverse the court's dismissal of that claim.

B.

The Wrongful Discharge Claim

As the Attorney General aptly recognizes, the choice-of-law analysis for plaintiff's wrongful discharge claim is more difficult than the failure-to-promote claim, especially given the present state of the limited record. The

42

state with the most significant relationship to that particular claim is not yet readily apparent. We mention in that regard a few preliminary considerations.

Plaintiff worked for defendants in Illinois, the state where he also lived. He was removed from that Illinois position by his New Jersey-based employer. The parties do not agree on the location(s) where the company officers made the decision to fire plaintiff. The record is also uninformative about the state where plaintiff allegedly acted improperly at the trade show, and exactly where the ensuing communications took place that led to his removal.

Given this context, the factor-by-factor Second Restatement analysis may differ with respect to plaintiff's wrongful discharge claim, as compared to his failure-to-promote claim. For example, plaintiff's post-discharge conduct in obtaining unemployment benefits under the laws of Illinois arguably may affect section 6(2)(d) ("the protection of justified expectations").[14] In addition, because the job from which plaintiff was fired was located at the Illinois office, the company arguably would have reasonable expectations that all of its supervisors and employees at that office, including plaintiff, would be

---

[14] In making this observation, we do not suggest that plaintiff is estopped from invoking New Jersey's antidiscrimination laws because he obtained unemployment benefits from the only state in which he presumably could seek them. We leave it to the trial court to assess to what extent plaintiff's action in obtaining that benefit under Illinois law is an important facet of the analysis.

commonly governed by Illinois employment laws. The "place of injury" under sections 145(2)(a) and 146 also seems to point to Illinois.

On the other hand, if plaintiff can establish that the company's decision to fire him was made or centered in New Jersey, that would be a counterweight on the New Jersey side of the scale. Many other facts and factors may also bear upon the calculus.

We do not adopt plaintiff's argument that if the decision to terminate him was made by individuals physically located in New Jersey, that singular nexus must necessarily overcome all other factors that may weigh elsewhere. For example, if hypothetically the firing decision were made by company officials while they all were on a business trip in Florida, that happenstance surely would not require Florida law to apply. The state where the decision was made – even assuming that is a singular place that can be ascertained – is simply one of many factors in the overall mix in identifying the state having the most significant relationship to that claim.

Rather than attempt to resolve this discrete choice-of-law assessment on an incomplete and disputed record, we remand that issue for a fuller development of the facts. Those facts should enable a new, more informed ruling by the trial court applying sections 6(2), 145, and 146 factors of the Second Restatement to plaintiff's wrongful discharge claim. The trial court

shall oversee the discovery needed to develop these issues, and reconsider its choice-of-law ruling upon renewed motion practice.

We do not forecast the outcome of this process, except to note that it would be legally permissible for New Jersey law to apply to plaintiff's failure-to-promote claim and for Illinois law to apply to his wrongful discharge claim. Conversely, the application of New Jersey law to both claims remains a conceivable option as well, depending on the development of the record affecting the Second Restatement factors.

VI.

We conclude with two observations that concern the practical significance of our decision today.

First, we are cognizant that the choice-of-law analysis becomes increasingly more complicated in our world as employees and their supervisors more often perform their work tasks remotely in multiple locations rather than in a traditional common physical location. The "office" where an individual works can be an elusive or non-existent concept these days. Work is now conducted often via digital means transcending jurisdictional boundaries. These trends invariably complicate the application of geographic factors in determining which states' laws apply to an employment relationship, absent

agreement of the parties. We do not presume in this opinion to begin to resolve those innumerable hypothetical scenarios.

Our second parting observation is that we expect employers will attempt to resolve uncertainty about the governing law by including in employment agreements clear and explicit choice-of-law provisions. Of course, such provisions in form employment contracts must be sufficiently clear in order to bind the parties, Martindale v. Sandvik, Inc., 173 N.J. 76, 95-96 (2002), and not contrary to constitutional or statutory principles. In any event, we anticipate that the analytic difficulties of the present case – in which there is no applicable written employment contract containing an enforceable choice-of-law provision – will occur less often in the future.

## VII.

Reversed on the failure-to-promote claim, and vacated and remanded on the wrongful discharge claim, in accordance with the terms of this opinion.

The trial court shall convene a case management conference within thirty days. The amici each shall duly advise the trial court whether they wish to continue to participate in some fashion at the trial level in any further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1576-17T3