## NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3219-19

STEPHANIE HALLIDAY,

    Plaintiff-Appellant,

v.

BIOREFERENCE
LABORATORIES, INC.,

    Defendant-Respondent.

_____

Argued September 14, 2021 – Decided August 3, 2022

Before Judges Sumners and Vernoia.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-6043-17.

Scott Newar, of the Texas Bar, admitted pro hac vice, argued the cause for appellant (Green Savits, LLC, attorneys; Scott Newar, of counsel and on the briefs; Glen D. Savits, on the briefs).

Amber M. Spataro argued the cause for respondent (Littler Mendelson, PC, attorneys; Amber M. Spataro and Dylan C. Dindial, on the brief).

PER CURIAM

Plaintiff Stephanie Halliday filed a single-count complaint alleging defendant Bioreference Laboratories, Inc. violated the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14, by terminating her employment in retaliation for complaints and objections she made to her supervisors concerning defendant's alleged operation of its Houston, Texas laboratory in contravention of federal safety and health regulations and the Clinical Laboratory Improvement Amendments of 1988 (CLIA), 42 U.S.C. § 263a to a-7.[1] Plaintiff appeals from an order granting defendant summary judgment, arguing the court erred by determining Texas law, and not New Jersey law under CEPA, applies to the resolution of her wrongful termination claim, and by concluding that even if CEPA applied, her cause of action should be dismissed because she failed to present evidence the termination of her employment is causally connected to her complaints.

---

[1] The CEPA claim also includes an allegation defendant terminated plaintiff's employment in retaliation for her complaints and objections concerning defendant's purported violations of the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651-678. That claim, and the court's summary judgment award to defendant on it, are not addressed in plaintiff's brief on appeal. We therefore do not address it. Drinker Biddle & Reath LLP v. N.J. Dept. of Law & Pub. Safety, 421 N.J. Super. 489, 496 n.5 (App. Div. 2011) (explaining an issue not briefed on appeal is deemed abandoned).

Based on our review of the record, the parties' arguments, and the applicable legal principles, we conclude there is a genuine issue of material fact that precluded the court's determination Texas law applies to defendant's CEPA claim and the court did not make adequate findings of fact and conclusions of law supporting its determination. R. 1:7-4. We do not address the merits of the court's determination defendant is entitled to summary judgment on the CEPA claim because the court did not make sufficient findings of fact and conclusions of law supporting its determination. We therefore vacate the court's order and remand for further proceedings.

I.

In our review of a summary judgment record, we limit our determination of the undisputed facts to those properly presented in accordance with Rule 4:46-2. Kenney v. Meadowview Nursing & Convalescent Ctr., 308 N.J. Super. 565, 573 (App. Div. 1998). We "must view the facts in the light most favorable to the non-moving party, which in this case is plaintiff." Bauer v. Nesbitt, 198 N.J. 601, 604 n.1 (2009) (citing R. 4:46-2(c)); Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). Applying these standards, we summarize the pertinent

facts gleaned from the parties' Rule 4:46-2 statements viewed in the light most favorable to plaintiff.[2]

Plaintiff's Employment At Defendant's Houston Laboratory

Defendant is a full-service clinical diagnostic laboratory that provides diagnostic testing and related services. Its headquarters and "core" laboratory are in Elmwood Park, New Jersey. It operates remote laboratories in three other states, including a laboratory in Houston, Texas where plaintiff exclusively worked. The parties dispute whether the Houston laboratory provided diagnostic testing and related services exclusively to patients from the state of

---

[2] We do not intend our summary of the facts, as lengthy as it is, to constitute a dispositive recitation of the facts that may be gleaned from the parties' Rule 4:46-2 statements. We provide the summary only to provide context for our discussion of the issues presented on appeal. As we explain, the court did not make adequate findings of fact and conclusions of law supporting its determination defendant is entitled to summary judgment, see R. 1:7-4, and we remand for the court to do so in the first instance. On remand, the court shall consider the parties' Rule 4:46-2 statements anew, make independent findings of fact, and correlate the facts to the law to support its determinations. R. 1:7-4; see also Curtis v. Finneran, 83 N.J. 563, 569-70 (1980) (requiring trial courts to clearly state their factual findings and correlate them with the relevant legal conclusions); Claypotch v. Heller, Inc., 360 N.J. Super. 472, 488-89 (App. Div. 2003) (explaining statements of material facts required for a summary judgment motion under R. 4:46-2). Our summary is not intended to be, nor should it be construed to be, a substitute for the motion court's obligation to consider the record presented in accordance with Rule 4:46-2 and make the findings required under Rule 1:7-4.

Texas.[3]  The summary judgment record lacks any evidence the Houston laboratory received and analyzed medical specimens from New Jersey patients.

Defendant's clinical laboratories are governed by CLIA.  Defendant's "ability to successfully operate [its] laboratories . . . depend[s] on [its] ability to . . . comply with all the CLIA requirements."  The "failure to comply with CLIA requirements" could result in "suspension, revocation or limitation of a laboratory's CLIA certificate," "significant fines and/or criminal penalties," and a requirement the laboratory "cease diagnostic testing."

Defendant's clinical laboratories must undergo on-site inspections at least once every two years to comply with CLIA.  The inspections may be performed by "the CLIA program" or by other private accrediting agencies, including the College of American Pathologists (CAP).

CAP is a peer review organization that inspects and accredits the Houston laboratory every two years.  CAP has its own protocols and best practices for accreditation which, if followed, ensure compliance with CLIA because CAP's standards and protocols meet or exceed CLIA's requirements.  A CAP inspection

---

[3]  Defendant claims all the samples tested at the laboratory are from Texas patients.  In her certification opposing the summary judgment motion, plaintiff asserts the Houston laboratory "did not receive patient samples solely from Texas patients."

A-3219-19

entails "an assigned inspector visit[ing] the laboratory during the daytime shift, review[ing] every department, and document[ing CAP standard] violations," which are also known as "deficiencies." Every year, defendant's Quality Systems Department (QS) conducts CAP-style mock inspections of its laboratories to identify deficiencies that should be corrected before CAP's official inspection. Defendant's New Jersey laboratory did not receive any citations for failure to comply with CAP standards in 2014 and 2016.

Defendant's policies bar retaliation against employees who report CLIA or any other violations. Defendant's "Compliance Reporting Policy" states, "[a]ll employees are protected from retribution or retaliation if they report any illegal acts." Defendant's "Code of Business Conduct & Ethics" states, "[u]nder no circumstances will any employee be subject to any disciplinary or retaliatory action as the result of filing a report of a violation or a potential violation [of defendant's code of conduct]."

On July 18, 2016, plaintiff began working for defendant as a night clinical supervisor at defendant's Houston laboratory. Prior to being offered the position, plaintiff interviewed with Charlyene Latimer, who was in New Jersey

at the time of the interview.[4]  Plaintiff also interviewed with Kristina Young, who was the then-manager of the Houston laboratory.

On October 27, 2016, plaintiff signed a job description that outlined her duties.  By signing the job description, plaintiff acknowledged she had been informed about "the expectations of [her] position" and that she would "be held accountable for all items in [the] job description."  Later, on March 1, 2017, plaintiff signed a training document stating she received initial training.  The record is unclear when plaintiff was trained on the tasks outlined in the initial training document, but she admitted she knew how to perform the tasks prior to signing the acknowledgement of training in March 2017.

When plaintiff began her employment, Young was the manager of the Houston laboratory and plaintiff's direct supervisor.  Rick Bar, who was based in California, was Young's direct supervisor.  In 2016, the director of the Houston laboratory was Dr. David Alrahwan.

In April 2016, New Jersey based members of the QS conducted a mock CAP inspection at the Houston laboratory.  During the inspection, QS identified multiple deficiencies in the laboratory.  The Houston operations team, including

---

[4]  The parties dispute whether Latimer was one of defendant's New Jersey-based employees or an independent recruiter.

Alrahwan, Young, and various laboratory supervisors, were responsible for remediating the deficiencies.

In August 2016, Emilce Santiago, who was then based in New Jersey, visited the Houston laboratory to assist Young in remediating deficiencies. Santiago also reviewed and signed monthly quality control (QC) documents that had not been contemporaneously reviewed and signed in accordance with CAP standards. QC processes detect, reduce, and correct deficiencies in a laboratory's internal analytical processes before patients' laboratory test results are released.

Lab supervisors are required to review QC documents monthly and compare laboratory results with those from a nationwide peer group to identify any bias or trend falling outside the reference range the manufacturer sets for the laboratory instrument under review. If the laboratory results are outside of the reference range, the laboratory must investigate and "perform corrective actions to ensure patient results were not impacted."

Following her visit to the Houston laboratory, Santiago reported her findings to Patricia Neybold, defendant's New Jersey-based Senior Director of Core Laboratory Operations. Based on Santiago's report, Neybold prepared a chart identifying ongoing deficiencies in the Houston laboratory, including with:

A-3219-19

the laboratory's "review and signing of monthly . . . QC documents"; "the creation of various standard operating procedures (SOPs)"; and the "creation of non-conforming event (NCE) forms for prior deficiencies" at the Houston laboratory.

On September 9, 2016, plaintiff emailed Brianna Russo, defendant's New Jersey-based QS supervisor, and advised her about continuing deficiencies occurring at the Houston laboratory, including deficiencies relating to staff performance and the documentation of SOPs. Specifically, plaintiff advised that the Houston laboratory had no "proper training/competency regimen," the instruments yielded "vastly different results," and "[t]he SOPs are not up to date and do not match the facility." In her email, plaintiff claimed patient results were inaccurate and she did not feel "comfortable releasing results nor confident that the patients are receiving valid results and quality care." In response to plaintiff's email, New Jersey-based representatives of defendant discussed sending employees to the Houston laboratory on an emergent basis to assess the issues plaintiff raised.

Shortly thereafter, Santiago and Neybold visited the Houston laboratory to train and retrain staff on QC processes and the instruments used in the laboratory. Neybold spoke to plaintiff about plaintiff's role as a laboratory

supervisor and subsequently sent plaintiff spreadsheets outlining examples of the types of tasks lab supervisors are expected to perform and when the tasks should be performed.

The parties dispute whether, during her visit to the Houston laboratory, "Neybold castigated [plaintiff]" for raising laboratory deficiencies. Plaintiff contends Neybold told her not to report deficiencies to QS and that plaintiff should instead make reports to Neybold and her direct supervisors first.

Plaintiff also asserts Neybold told her to be a "team player," and not be "penny wise and pound foolish." Defendant contends Neybold never told plaintiff not "to be penny wise and pound foolish," and, when Neybold advised plaintiff to be a team player, Neybold was referring to plaintiff's alleged behavior of speaking to other employees in a condescending manner. Defendant also contends the alleged statement is irrelevant because Neybold made it eight months prior to plaintiff's termination, and Neybold was not involved in the decision to terminate plaintiff's employment.

After Santiago and Neybold visited the Houston laboratory in September 2016, Jonathan Mylotte visited the laboratory to train plaintiff on the "[m]aster [c]ontrol system"—the system that stores template SOPs. Plaintiff admitted

Mylotte was "very knowledgeable," and she observed QC review had "improved considerably . . . with corrective actions."

Following the issues in the Houston laboratory, James Weisberger, defendant's New Jersey-based chief medical officer, terminated Bar because he attributed the Houston laboratory's issues to problems with its management and oversight.

On October 3, 2016, defendant hired Michael Duffy, to replace Bar as the vice president of remote operations. During the relevant time period, Duffy lived in Washington State, but he traveled approximately eighty to eighty-five percent of the time to oversee defendant's remote laboratories in Florida, Texas, and California. Duffy's travels to New Jersey were infrequent, and he did not supervise any New Jersey-based employees. Although Duffy lives in Washington, he lists defendant's New Jersey office on his business card to avoid using his Washington home address.

On October 13, 2016, Jane Pine Wood, defendant's New Jersey-based chief compliance officer, visited the Houston laboratory to conduct annual compliance retraining. After one of the training sessions, Wood spoke to plaintiff and Mwenya Sampa, the Houston laboratory microbiology supervisor, who complained about insufficient training at the laboratory. Several Houston

11

laboratory employees refused to sign an acknowledgment form stating they were "not aware of any violation of [defendant's c]ompliance [p]rogram or any other company policy." Plaintiff signed the acknowledgment with the caveat that she addressed compliance issues with Wood. Plaintiff admitted Wood did not coerce or force her to sign the form.

On October 13, 2016, Wood contacted Weisberger about compliance issues raised by some of the Houston employees, and Weisberger advised he was aware of the issues and was working to correct them. The following day, Weisberger arranged to visit the Houston laboratory to interview employees and assess the status of the efforts to correct the previously identified issues in the laboratory. Duffy accompanied Weisberger while he was at the Houston laboratory.

In an October 15, 2016 email, Weisberger stated that while he is in Houston, he can "interview whomever . . . including [plaintiff] ('the so-called CLIA inspector')." Plaintiff contends Weisberger mocked plaintiff's whistleblowing about problems at the Houston laboratory by calling her the "so-called CLIA inspector," referring to her prior employment as a CLIA inspector.[5]

---

[5] The record does not establish plaintiff was a CLIA inspector prior to her employment by defendant. Defendant contends that prior to its employment of

Defendant further contends Weisberger's reference to plaintiff in the email is irrelevant because it was made seven months prior to plaintiff's termination, and Weisberger was not involved in the decision to terminate her.

While they were in Houston, Duffy and Weisberger interviewed approximately fifteen to twenty employees, some of whom, including plaintiff, Sampa, and Rhonda Fortney, stated there were compliance issues at the laboratory. After his visit, Weisberger ordered the Houston laboratory to cease testing for one day to conduct training and ensure its employees were competent in their job duties. Because of the large number of deficiencies at the Houston laboratory, remediation of the laboratory's problems was ongoing for several months.

In mid-November 2016, defendant transferred Santiago from New Jersey to the Houston laboratory, and Young began reporting directly to her. On December 13, 2016, Duffy terminated Young's employment because of her deficient work performance, and Santiago replaced Young as the Houston laboratory's manager. Shortly thereafter, in January 2017, Dr. Ross Miller replaced Alrahwan as the director of the Houston laboratory.

---

plaintiff, she was on a probationary status with the Texas Department of State Health Services but was terminated shortly she after was hired because she was "not considered suited to the position assigned."

Santiago's work at the Houston laboratory entailed overseeing operations, improving production, managing Houston laboratory employees, and preparing necessary documents for the 2017 CAP inspection. In February and March 2017, QS personnel from New Jersey began visiting the Houston laboratory to conduct "mock" CAP inspections. After its inspections, QS personnel prepared a spreadsheet of laboratory deficiencies and necessary remedial measures. Santiago expected plaintiff to assist her in correcting the laboratory deficiencies, and she notified plaintiff about her expectations.

Although Santiago directed plaintiff to review and sign off on monthly QC documents that Young had not contemporaneously reviewed as required under CLIA, plaintiff did not perform that task. Plaintiff stated that during her prior employment as a State of Texas inspector, one of her duties included reviewing QC documents. She admitted that when she was an inspector, if a laboratory did not present signed documentation of monthly QC review, she would cite the laboratory and direct it to remediate the issue. Remediation required the laboratory to conduct QC review and sign the documentation for the current date, even if the QC was from an earlier period.

During a March 13, 2017 meeting, Russo, Stacey Arras from QS, and Santiago advised plaintiff to sign and date QC documents on the date she

reviewed them. Plaintiff refused to sign off on the QC documents because "they could have signed it themselves."

On April 5, 2017, Santiago met with plaintiff and asked her to perform all the QC document reviews, which plaintiff had failed to do up to that date. Plaintiff asserts that on April 5, 2017, Santiago instructed her to sign QC documents for dates on which she had not been employed by defendant. Plaintiff further avers Santiago told her "'they'—referring to New Jersey-based [defendant's] officials—required [her] to do this." Plaintiff also certified that throughout her employment with defendant, the company's "New Jersey based officials—including . . . Neybold and . . . Russo . . . oversaw [her] work and required [her] to report directly to them about numerous issues that occurred in the Houston lab."

During the spring of 2017, Santiago reported to Duffy the following performance-related issues relating to plaintiff:

> (1) Plaintiff did not contemporaneously review and sign off on monthly QC documentation as required by CAP and as part of her job duties for which she had been trained, and plaintiff admitted it is the supervisor's job to review QC charts before releasing patient results;
>
> (2) In September 2016, Neybold notified plaintiff she needed to "re-look at the evening & night shift QC to make sure nothing is missed," and Neybold advised

15

plaintiff that "those results were run under [her] shift so [she] can't take this lightly";

(3) Even though investigating and drafting NCEs was part of her job duties, on March 9, 2017, plaintiff asked where the NCE form was located after discovering on February 24, 2017 that employees were running patient samples on an instrument QC determined was out of an acceptable range[6];

(4) On March 13, 2017, Russo and Arras returned an NCE form to plaintiff to rewrite more thoroughly and suggested that she read the NCE SOP before rewriting the NCE;

(5) On March 14, 2017, Santiago followed up with plaintiff regarding tasks Santiago assigned to her during their meetings on February 22, 2017, and March 2, 2017;

(6) On April 3, 2017, Russo advised plaintiff, "QC needs to be evaluated for trends and shifts from the date the previous [review] was done" until it was actually performed in 2016, but instead of reviewing QC, plaintiff responded, "[f]rom when I started, the QC did not look so good around this time period." Later on April 3, 2017, Santiago followed up with plaintiff again because she had not received a response from plaintiff. Plaintiff responded that many of the tasks assigned to her were not her responsibility, but plaintiff's job description states it is her duty to "perform[] other tasks as specified by the manager/director."

(7) On April 13, 2017, Russo requested documents from plaintiff to support an NCE she was preparing, but

---

[6] Santiago also reported that on March 31, 2017, plaintiff released patient test results that were out of range, but plaintiff repeatedly denied releasing them.

16

plaintiff sent Russo illegible copies of QC printouts, which did not provide evidence of compliance in the NCE;

(8) On April 19, 2017, Neybold emailed plaintiff regarding various tasks that needed to be completed prior to the CAP inspection; although Neybold emailed plaintiff again on April 26, 2017, Neybold received no reply or call to the emails as of May 4, 2017.

After receiving plaintiff's response to her April 3, 2017 email, Santiago forwarded the email chain to Duffy. Duffy responded, stating plaintiff "is clearly insubordinate" and "has no intention of following direct requests." Duffy also stated they should consider terminating plaintiff. Plaintiff admitted she said, "[i]t is insubordination not to follow orders from your supervisor."

On Friday, April 28, 2017, plaintiff texted Santiago a few hours before her shift was to begin and advised she would not be able to report to work that night. Earlier that day, Santiago discovered the laboratory had multiple bottles of reagents—chemicals used in testing patient samples—that had expired in December 2016. Because the expired reagents could not be used in the testing of patient samples, the laboratory did not have sufficient reagent inventory to perform patient testing. Santiago attempted to contact plaintiff about this issue by calling her seven times, sending her an email, and leaving a voicemail;

17

however, plaintiff did not respond until the following week, on Monday, at the earliest.[7]

When plaintiff responded, she stated Santiago missed the expired reagents during prior inspections because plaintiff wrapped them up and placed them "in the back." Plaintiff thought it wasteful to throw the expired reagents out when they could be donated or used in trainings, and that is why she wrapped them. Plaintiff admitted no one told her to wrap the expired reagents and there had been issues at the Houston laboratory with employees using expired reagents.

If expired reagents are used for patient testing, it is not possible to determine if the test results are reliable. Plaintiff's supervisors repeatedly advised her to inspect for expired reagents, and to notify them when she saw any expired reagents.

In early May 2017, Santiago spoke with plaintiff on the telephone about the expired reagents and plaintiff's failure to respond to Santiago's attempted communications. Plaintiff became angry at Santiago and raised her voice.

---

[7] Plaintiff claims she spoke to Santiago on Monday, May 1, 2017, but defendant asserts she did not respond until Tuesday, May 2, 2017.

Around this time, and prior to May 4, 2017, Duffy and Santiago spoke about issues Santiago was having with plaintiff's performance.[8] Santiago advised Duffy she was "struggling" with how to handle plaintiff's insubordination and performance deficiencies.

On May 4, 2017, Duffy had a meeting in New Jersey with Neybold and Jeanne Calton, who works in the defendant's human resources department in New Jersey, to discuss options to address plaintiff's alleged performance deficiencies and insubordination. Calton recalled that during the meeting, it was agreed Neybold and Duffy would prepare a performance improvement plan (PIP) for plaintiff and then share it with Calton.

On May 5, 2017, Duffy requested that Santiago send him more information regarding plaintiff's performance deficiencies and insubordination. Santiago responded by sending him multiple emails detailing the performance issues. According to Duffy, based on the emails and his conversations with Santiago, and while at his home office in Washington, he decided to terminate

---

[8] The evidence to which defendant cites does not specify the date Duffy spoke to Santiago, but we infer that any conversation occurred prior to May 4, 2017 because Duffy spoke about plaintiff's performance issues raised by Santiago at a May 4, 2017 meeting.

plaintiff's employment, and he communicated his decision to Calton on May 8, 2017.

Duffy did not place plaintiff on a PIP or impose any corrective action directives prior to terminating her because he believed such a plan or action would not be effective. According to Duffy, he did not discuss his termination decision with anyone prior to making the decision; he did not seek advice before making the decision; and he was not influenced by anyone when making the decision.

As noted, during the May 4, 2017 meeting, Calton had explained to Duffy and Neybold the options of either terminating plaintiff or placing her on a PIP, but she did not make any recommendation regarding which action should be taken. According to Duffy, the decision to terminate plaintiff was his alone. Calton admitted she would not have recommended terminating plaintiff because her file did not contain any previous disciplinary actions.

Neybold testified that as of May 8, 2017, she did know Duffy had decided to terminate plaintiff, and she denied any involvement in the decision-making process that led to plaintiff's termination. In a May 8, 2018 email to Calton and Duffy, Neybold stated, "I was just wondering how the PIPs or whatever you want to call the paperwork is coming along? Do you need any more information

20

from me or clarification from what I submitted on" plaintiff and another employee Neybold identified by name.

By the following day, Neybold had apparently become aware of a decision to terminate plaintiff and another employee. Neybold sent a May 9, 2017 email to Calton, asking "[w]hat <u>do we need to do to get the [two] term[inations] done</u>? Please let me know." (Emphasis added). Calton responded via email, stating, "I did discuss with Ilene [Nelson, a human resources representative from defendant's parent company, OPKO,] the termination for [plaintiff]. This one will take a bit longer <u>if that is the route we wish to take</u>." (Emphasis added). Thus, Calton's email suggested a decision to terminate plaintiff had not yet been made.

In the email, Calton further stated that Nelson asked her to "discuss up" the termination of plaintiff with Vaughn Klug, defendant's then New Jersey-based in-house employment law counsel, because Nelson "wants anything like this to go through [Klug]."[9] Calton also stated Klug has been "off site for the last few days," and she was not confident they "would have a document by this

---

[9] The email permits the inference Klug also worked for defendant in New Jersey. That is because Calton, who worked in New Jersey, states in the email to Neybold that she was unable to speak with Klug because he had been "off site for the last few days."

week."  Neybold responded to Calton's email, stating, "Thank you so much for your help."

On May 10, 2017, Weisberger received a copy of an April 29, 2017 letter from CAP stating it would conduct an "unannounced" inspection of the Houston laboratory within ninety days.  Minutes after receiving the letter, Weisberger sent an email to Duffy, Miller, Santiago, Neybold, plaintiff, and others attaching CAP's letter and stating, "[t]his is not good.  CAP is sending their own inspectors rather than a reciprocal lab."

In a May 10, 2017 email, Santiago asked Neybold why Weisberger said the CAP inspection is "not good."  Neybold responded, "Normally when people from other labs come, they are more understanding then when they come from CAP."

In another May 10, 2017 email, Duffy wrote to Neybold and Calton stating, "[w]here are we with [plaintiff]?  I am in Houston this week and would like to be able to deal with it this week.  Let me know.  Thanks."  Calton responded, "I literally just hung up with [Klug].  I will give you a call to discuss."

Duffy apparently obtained an answer to his email inquiry to Neybold and Calton. On May 10, 2017, he advised Santiago he would be terminating plaintiff's employment and asked Santiago to set up a meeting to do so.

The next day, May 11, 2017, Duffy terminated plaintiff's employment. The termination occurred at the Houston laboratory, with Duffy, Santiago, and plaintiff physically present and Calton participating via telephone from New Jersey. Plaintiff was provided a proposed "Severance Agreement and General Release," which in part states, "[t]he validity, interpretation and performance of this Agreement shall be construed and interpreted according to the laws of the State of New Jersey."

Although Duffy knew about the compliance-related complaints plaintiff raised in October 2016, he was not aware of any other complaints plaintiff may have made during her employment. Plaintiff never told any of defendant's employees she would expose the Houston laboratory's deficiencies to CAP, and she admitted she could report CAP violations "at any time," even after her employment was terminated. Weisberger and Wood were not involved in the decision to terminate plaintiff's employment, and they were not aware of plaintiff's termination until after it occurred.

A-3219-19

Plaintiff admits she has no knowledge regarding who made or was involved in the decision to terminate her employment. Plaintiff further admits she did not know or suspect she would be terminated, nor did she speak to any of defendant's employees about her termination after it occurred.

Fortney, who reported compliance issues in the Houston laboratory with Duffy and Weisberger in October 2016, remains one of defendant's employees and has never been retaliated against for raising compliance issues. Sampa, who raised compliance issues in the Houston laboratory to Wood, Duffy, and Weisberger in October 2016, was one of defendant's employees until March 2017, when she resigned to "accept new challenges in [her] career." Sampa resigned from her employment with defendant on good terms and remains eligible for rehire.

Neybold testified she did not participate in the decision to terminate plaintiff and she did not learn that Duffy decided to terminate plaintiff until the May 11, 2017 meeting during which Duffy terminated plaintiff.

During CAP's 2017 inspection of the Houston laboratory, Santiago advised the inspector that the QC documents were not reviewed and signed monthly but were instead reviewed and signed later. At all relevant times,

24

Weisberger, Neybold, Calton, and Wood worked at defendant's New Jersey headquarters.

Defendant's Summary Judgment Motion

Defendant moved for summary judgment, arguing Texas law governed the termination of plaintiff's employment and therefore plaintiff's CEPA claim must be dismissed. In the alternative, defendant argued that even if New Jersey law applied, the CEPA claim fails as a matter of law because plaintiff lacks evidence establishing a causal connection between her alleged whistleblowing activity— her complaints and objections concerning the Houston laboratory's practices she claims violated CLIA—and the termination of her employment.

The court heard argument and, in a decision from the bench, found Texas law applied because plaintiff resided and worked for defendant in Texas, defendant hired and terminated plaintiff in Texas, plaintiff's complaints and objections related solely to the Houston laboratory, and the decision to terminate plaintiff's employment was not made in New Jersey. The court also found defendant was entitled to judgment on the merits of plaintiff's CEPA claim because she did not present evidence establishing a causal connection between her complaints and objections and her termination. The court entered an order granting defendant summary judgment, and this appeal followed.

A-3219-19

II.

"We review de novo the trial court's grant of summary judgment, applying the same standard as the trial court." Abboud v. Nat'l Union Fire Ins. Co., 450 N.J. Super. 400, 406 (App. Div. 2017). This standard mandates the grant of summary judgment "if the pleadings, depositions, answers to interrogatories[,] and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c).

Plaintiff first argues the court erred by determining Texas law, and not New Jersey law under CEPA, applies to the parties' dispute over the termination of her employment. Plaintiff claims CEPA conflicts with Texas employment law, the Legislature intended that CEPA apply to out-of-state residents, and New Jersey law applies because New Jersey has the most significant relationship to the alleged retaliatory termination of her employment.

"[W]hen New Jersey is the forum state, its choice of law rules control." Calabotta v. Philbro Animal Health Corp., 460 N.J. Super. 38, 54 (App. Div. 2019) (alteration in original) (quoting Fairfax Fin. Holdings Ltd. v. S.A.C. Cap. Mgmt., LLC, 450 N.J. Super. 1, 34 (App. Div. 2017)). Under our choice-of-law rules, a court must first determine "whether the laws of the states with interests

in the litigation are in conflict." In re Accutane Litig., 235 N.J. 229, 254 (2018) (quoting McCarrell v. Hoffmann-La Roche, Inc., 227 N.J. 569, 593-94 (2017)).

There is a conflict between the laws of different states "when the application of one or another state's law may alter the outcome of the case, or when the law of one interested state is 'offensive or repugnant' to the public policy of the other." Ibid. (citations omitted). If no conflict exists, then "the forum state applies its own law to resolve the disputed issue." Cont'l Ins. v Honeywell Int'l, Inc., 234 N.J. 23, 46 (2018) (quoting Rowe v. Hoffman-LaRoche, Inc., 189 N.J. 615, 621 (2007)).

Here, the parties agree there is a conflict between Texas and New Jersey law as they pertain to plaintiff's claims arising from the termination of her employment. And we find such to be the case.

Plaintiff's CEPA claim is founded on two different theories. She alleges her employment was terminated in part in retaliation for reporting actions, practices, and policies at the Houston laboratory to her supervisors that she claims violated CLIA. She also claims her termination was in retaliation for her refusal to participate in an activity—signing QC forms she claims she could not properly execute—she reasonably believed violated the law. CEPA authorizes a cause of action based on both allegations.

A-3219-19

CEPA prohibits an employer from taking retaliatory action against an employee who "[d]iscloses, or threatens to disclose to a supervisor . . . an activity, policy or practice of the employer . . . the employee reasonably believes . . . is in violation of a law, or a rule or regulation promulgated pursuant to law[.]"  N.J.S.A. 34:19-3(a)(1).  It also prohibits retaliatory adverse action against an employee who "[o]bjects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes . . . is in violation of a law, or a rule or regulation promulgated pursuant to law."  N.J.S.A. 34:19-3(c)(1) (emphasis added).  The statute expressly provides a cause of action and various remedies to an employee aggrieved by an employer's unlawful retaliatory action.  N.J.S.A. 34:19-5.

Texas law does not provide a cause of action for an employee who suffers an adverse employment action in retaliation for objecting to, or reporting to his or her supervisor, actions or practices of the employer that he or she reasonably believes violate the law.  Under Texas law, "absent a specific agreement to the contrary, employment may be terminated by the employer or the employee at will, for good cause, bad cause, or no cause at all."  Sawyer v. E.I. du Pont de Nemours & Co., 430 S.W.3d 396, 399 (Tex. 2014) (quoting Montgomery Cnty. Hosp. Dist. v. Brown, 965 S.W.2d 501, 502 (Tex. 1998)); see generally Schmidt

v. Celgene Corp., 425 N.J. Super. 600, 607 (App. Div. 2012). The Texas Legislature "has created a few narrow exceptions" to the application of the state's employment-at-will legal principle, ibid., but none are applicable here.[10]

Under Texas common law, there is an exception to the at-will employment principle that "prohibits an employee from being discharged for refusing to perform an illegal act." Ibid. (quoting Sabine Pilot Serv., Inc. v. Hauck, 687 S.W.2d 733, 735 (Tex. 1985)). The exception provides a "cause of action" in Texas "for wrongful discharge for an employee who can establish termination

---

[10] The Texas Supreme Court has noted that the statutory exceptions to the governing at-will employment principle in Texas include, "discharge based on certain forms of discrimination," ibid., under TEX. LAB. CODE § 21.051 (prohibiting employment discrimination based on race, color, disability, religion, sex, national origin, age), id. at 399, n. 8; and

> TEX. GOV'T CODE § 437.204 (serving in the state military forces); TEX. LAB. CODE §§ 21.055 (opposing a discriminatory practice; filing a charge or complaint; or participating in an investigation, proceeding, or hearing), 101.052-.053 (being a member or nonmember of a union), 451.001 (filing a workers' compensation claim); TEX. CIV. PRAC. & REM. CODE § 122.001 (performing jury service); TEX. FAM. CODE § 158.209 (being subject to an order or writ of withholding from wages for child support),

[Id. at 399, n. 9.]

based solely on the employee's refusal to participate in illegal conduct." Schmidt, 425 N.J. Super. at 607.

Here, CEPA and Texas law provide causes of action for plaintiff's claim she was terminated based on her refusal to perform what she contends is an illegal act, executing certain QC forms. See ibid.; N.J.S.A. 34:19-3(c)(1). Texas law does not provide a cause of action for plaintiff's claim that she was terminated in retaliation for objecting to, or disclosing to a supervisor, an activity, policy, or practice she reasonably believed violated a law, or rule or regulation promulgated pursuant to law. However, that cause of action is supported by CEPA. See N.J.S.A. 34:19-3(a)(1). Thus, there is a "substantive difference" between the applicable laws of Texas and New Jersey because the failure of Texas law to support a cause of action for portion of plaintiff's claim "is offensive or repugnant to the public policy of" New Jersey as reflected in CEPA. Cont'l Ins., 234 N.J. at 46 (quoting DeMarco v. Stoddard, 223 N.J. 363, 383 (2015)); see also Fairfax, 450 N.J. Super. at 42-43 (explaining a conflict between the laws of two states exists if "one state provides a cause of action but the other does not").

Where, as here, a conflict between the States' laws exists, and the claim involves alleged tortious conduct, a court must "apply the choice-of-law

principles described in the Second Restatement [of Conflicts of Laws Restatement (Second)], particularly sections 6, 145, and 146."[11] Calabotta, 460 N.J. Super. at 54-55. However, under the Restatement (Second), a conflict between the laws of two states "does not always lead to a choice-of-law analysis." Fairfax, 450 N.J. at 43. A choice-of-law analysis is unnecessary and "preempted when our Legislature has determined that New Jersey public policy requires the application of our substantive law whenever our courts have jurisdiction over the kind of claim, regardless of the interest of another state." Ibid. Under Section 6(1) of the Second Restatement, "[a] court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law." Restatement (Second) § 6(1).

---

[11] In Montells v. Haynes, the Court determined an injury under the New Jersey Law Against Discrimination Act (LAD), N.J.S.A. 10:5-1 to -50, is more akin to a tortious injury than to an injury arising from a breach of contract. 133 N.J. 282, 291-92 (1993). In Calabotta, we applied principles applicable to tortious conduct in our analysis of choice-of-law issues pertaining to an LAD claim. 460 N.J. Super. at 57. We apply the same principles to plaintiff's CEPA claim. See Feldman v. Hunterdon Radiological Assocs., 187 N.J. 228, 241 (2006) (explaining "courts frequently compare CEPA to LAD [and] apply[] the legal tests and frameworks developed under one to the other, because '[both are] civil rights statute[s]'" (quoting Kolb v. Burns, 320 N.J. Super. 467, 477 (App. Div. 1999))); see also N.J.S.A. 34:19-5 (stating under CEPA that "in addition to any legal or equitable relief provided," "[a]ll remedies available in common law tort actions shall be available to prevailing plaintiffs").

Where a legislative directive to apply a state's law cannot be ascertained "either through 'an explicit statutory directive' or 'by a process of interpretation and construction,'" Calabotta, 460 N.J. Super. at 55 (quoting Fairfax, 450 N.J. at 47), we "apply the most-significant-relationship test in tort matters to resolve choice-of-law questions," ibid. If no statutory directive is discerned, a court applies New Jersey law if New Jersey has the "most significant relationship" to the matter in light of the facts pertinent to the asserted claim. Ibid.

To determine whether there is a statutory directive requiring application of CEPA to a claim asserted by a Texas resident employed in Texas by a New Jersey company with its headquarters in New Jersey, we must first consider whether CEPA "is broad enough to extend to" plaintiff, and, if so, we must also decide if "the Legislature issued through [CEPA] a choice-of-law 'directive' that compels our courts to apply New Jersey law to such plaintiffs and employers, rather than conflicting out-of-state laws[.]" Calabotta, 460 N.J. at 59-60.

With regard to the first inquiry, we are persuaded CEPA is sufficiently broad to extend to plaintiff as an employee of a New Jersey corporation that is also headquartered in this State. CEPA is the most "far reaching 'whistleblower statute' in the nation." Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 555 (2013) (quoting Mehlman v. Mobil Oil Corp., 153 N.J. 163, 179 (1998)). Our

32

Supreme Court has explained "CEPA is 'remedial legislation[]' [that] 'should be construed liberally to effectuate its important social goal'—'to encourage, not thwart, legitimate employee complaints.'" Donelson v DuPont Chambers Works, 206 N.J. 243, 256 (quoting Dzwonar v. McDevitt, 177 N.J. 451, 463 (2003)).

CEPA broadly defines an "employer" as "any individual, partnership, association, corporation or any person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent." N.J.S.A. 34:19-2 (emphasis added). CEPA also expansively defines an "employee" as "any individual who performs services for and under the control and direction of an employer for wages or other remuneration." Ibid. (emphasis added); see also Lippman v. Ethicon, Inc., 222 N.J. 362, 381 (2015) (observing "our case law has extended the reach of [CEPA's] definition [of an employee], not restricted it"). The statute does not limit the definition of employer to persons or entities located in New Jersey, and the definition of employee is not restricted to individuals performing services in New Jersey. See Lippman, 222 N.J. at 379 (noting "our case law has taken an inclusive approach in determining who constitutes an employee [under CEPA] for purposes of invoking the protection of this remedial legislation").

33

Based on CEPA's broad remedial purposes and inclusive text, and our obligation to construe the statue "liberally to effectuate its important social goal" of "protect[ing] and encourag[ing] employees to report illegal or unethical workplace activities and to discourage . . . employers from engaging in such conduct," Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 431 (1994), we are convinced the Legislature did not intend to limit the statute's protections to only employees who live and work in New Jersey. Thus, subject to other choice-of-law factors, plaintiff may assert a CEPA claim even though she lived and worked for defendant in Texas. See Calabotta, 460 N.J. at 61.

A determination that CEPA provides a cause of action for an employee who lives and works in another state does not end our analysis. The fact that "a New Jersey statute could embrace certain claims by out-of-state parties does not necessarily mean that those New Jersey laws inexorably must override contrary laws from other jurisdictions." Id. at 65-66. The purpose of New Jersey's choice-of-law jurisprudence "is to promote interstate comity and due respect for the laws and interests of sister states, rather than automatically impose New Jersey law in some provincial or overly aggressive fashion." Id. at 66.

We next consider "whether the Legislature has clearly directed that our courts must apply [CEPA] to cases where choice-of-law issues arise because of

34

conflicting laws of other states." Id. at 65. CEPA is devoid of a statutory directive concerning choice-of-law issues and it is bereft of any suggestion the Legislature intended that the statute preempt the otherwise applicable choice-of-law analysis. See generally Fairfax, 450 N.J. Super. at 44. Lacking any such directive in CEPA, we conclude application of New Jersey's choice-of-law analytical framework is necessary to determine whether New Jersey or Texas law governs the issues concerning the termination of plaintiff's employment. See ibid.; see also Calabotta, 460 N.J Super. at 59-67.

"[T]he most-significant-relationship test" is applied "in tort matters to resolve choice-of-law questions." Calabotta, 460 N.J Super. at 55; see also Restatement (Second) § 145(1). "To determine whether New Jersey has the most significant relationship, [a court is required to consider] sections 145 and 146 [of the Restatement (Second)], which provide the general principles for tort actions, as well as section 6, which outlines universal principles for choice of law issues." Id. at 55-56; see also In re Accutane, 235 N.J. at 260. The analytical process begins with a presumption under section 146 that in tort actions "the law of the state where the injury occurs applies." Id. at 56 (quoting In re Accutane, 235 N.J. at 259).

Here, plaintiff concedes the injury upon which her CEPA claim is based occurred in Texas, and there is no dispute the alleged unlawful action that caused her injury—the termination of her employment—took place in Texas. Therefore, under section 146, there is a presumption Texas law applies. Ibid.; see also In re Accutane, 235 N.J. at 259.

To overcome the presumption and apply New Jersey law, the motion court was required to determine whether New Jersey "has a more significant relationship with the parties . . . based on an assessment of each state's contacts viewed through the prism of section 145 . . . and section 6." Ibid. (quoting In re Accutane, 235 N.J. at 259) see also Restatement (Second) § 146.

Section 145 requires consideration of four contacts to determine whether New Jersey or Texas has the most significant relationship to the alleged retaliatory termination of plaintiff's employment and the parties "under the principles stated in [section] 6." Ibid. (quoting Restatement (Second) § 145(2)); see also Fairfax, 450 N.J. at 50-51. The four contacts "include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." Restatement (Second) § 145(2).

The motion court referred to, and listed, the four contact factors that must be addressed under section 145, but the court made scant factual findings concerning them. See R. 1:7-4. The court noted it "painstakingly" reviewed the facts, but determined they favored a finding Texas law applied based only on findings plaintiff resided in Texas and was hired and fired there, and all plaintiff's actions, which she claimed resulted in her termination, concerned the practices and policies of the Houston laboratory. The court determined the facts presented in the summary judgment record did not demonstrate that New Jersey-based supervisors and employees were involved in the decision to terminate plaintiff or had any hand in any "retaliation" against plaintiff. The court concluded there was a presumption Texas law applied because that is the place where the injury occurred, see Restatement (Second) § 146, and opined that, in its view, New Jersey law did not have a more significant relationship with the matter than Texas.

The court's limited findings support a determination the first and third contact factors under section 145 favor the application of Texas law. The first contact—the place where the injury occurred—favors application of Texas law because, as plaintiff concedes, she was injured by the wrongful termination of her employment in Texas. The third contact also favors a finding Texas law

37

should apply; plaintiff is domiciled and resides in Texas and defendant has a place of business in Texas—the Houston laboratory where plaintiff was employed, the alleged unlawful practices under CLIA occurred, and plaintiff was terminated. Defendant's headquarters are in New Jersey, and plaintiff communicated at times with defendant's employees there, but she worked exclusively at the Houston laboratory.

Although essential to a choice-of-law determination under section 145, the court did not make any findings concerning the second contact factor—the place where the conduct causing the injury occurred—or the fourth factor—the place where the relationship between the parties is centered. Consequently, in our view, the court could not properly determine the place where the conduct causing the injury occurred because that issue is rife with genuine issues of material fact. See R. 4:46-2(c) (providing in part a motion for summary judgment may be granted only where the competent evidence "show[s] there is no genuine issue of any material fact").

The conduct causing the injury is not, as defendant suggests, limited to the meeting in Houston during which Duffy terminated plaintiff's employment. Plaintiff's CEPA claim is based on a challenge to defendant's decision to terminate her employment. She alleges the decision to terminate her

employment was made in retaliation for various actions she took that constituted protected activity under CEPA. Thus, a determination of the place where the conduct causing the injury occurred is, at least in part, dependent on the place where the decision to terminate her employment was made.

Defendant argues the undisputed facts establish the decision to terminate plaintiff's employment was made exclusively by Duffy while he was in Washington; he made the decision to terminate plaintiff's employment without input from anyone; and he did not discuss his decision to terminate her employment with anyone. To be sure, that is what Duffy stated during his deposition testimony, and it may be true. There is, however, conflicting evidence supporting a finding defendant's New Jersey employees, including Neybold, Calton, and Klug, actively participated in the process that resulted in the decision to terminate plaintiff's employment while they were physically located in New Jersey. Indeed, the motion court recognized "[t]here is a contesting issue whether any discussions concerning plaintiff's termination were contemplated or discussed in New Jersey."

The evidence establishes Duffy and Neybold met with Calton, defendant's New Jersey-based human resources representative, in New Jersey on May 4, 2017, to discuss options to address plaintiff's alleged performance deficiencies

39

and insubordination. According to Calton, those options included terminating plaintiff's employment. However, it was agreed Neybold and Duffy would develop a PIP for plaintiff and share it with Calton. That is, Neybold and Duffy agreed that Calton, defendant's New Jersey-based human resources representative, would review the planned PIP for plaintiff before it was implemented at plaintiff's place of employment in Houston.

Duffy testified he later decided to terminate plaintiff's employment but the evidence, viewing it in the light most favorable to plaintiff, suggests the decision was subject to the review, input, involvement, and approval of defendant's New Jersey employees. By May 9, 2017, a decision to terminate plaintiff's employment was being discussed, and Neybold was directly involved in what appears was a collective effort to effectuate the termination—she sent a May 9, 2017 email to Calton asking "[w]hat do we need to do to get" the "term[ination] done?"

In response to Neybold, Calton explained she discussed plaintiff's termination with Ilene Nelson, a human resources representative with defendant's parent company. Calton further stated plaintiff's termination "will take a bit longer if that is the route we wish to take." Those statements support a reasonable inference plaintiff's putative termination was discussed directly

with Calton, and that Calton further discussed the issues with defendant's parent corporation, before a final decision to terminate her employment was made. If a final decision by Duffy alone had actually been made by that time, as Duffy testified it was, Calton would not have stated plaintiff's termination would take longer "if that"—the termination—"is the route we wish to take."

That language supports two additional reasonable inferences that are inconsistent with defendant's claim Duffy made the termination decision on his own in Washington without any input from anyone in New Jersey.[12] First, Calton's use of the term "we" permits the reasonable inference that more than one person, including Calton and Neybold who were parties to the email, were involved in deciding to terminate plaintiff's employment. Second, Calton's use of the term "if" to refer to plaintiff's possible termination suggests the decision had not yet been made and that more conversation, input, and consultation was required before a final decision would be made.

Both inferences are inconsistent with defendant's assertion Duffy made the decision to terminate plaintiff's employment without any involvement of defendant's representatives in New Jersey. The inferences also contradict

---

[12] The inferences also contradict Neybold's testimony she did not have any involvement in the decision to terminate plaintiff's employment.

A-3219-19

Neybold's testimony she did not have any involvement in the decision to terminate plaintiff's employment. It therefore appears that despite defendant's protestations to the contrary, there is a fact issue as to whether Calton and Neybold were involved in the decision-making process from the defendant's corporate offices in New Jersey.

There is more. In the same email, Calton advises Neybold that Nelson asked her to discuss plaintiff's putative termination with Klug, an attorney employed by defendant in New Jersey, and that Nelson "wants anything like this"—plaintiff's termination—"to go through" Klug. In other words, Nelson directed that plaintiff's termination be monitored and processed by Calton in New Jersey and reviewed by defendant's counsel in New Jersey. Neybold responded to Calton's email by thanking Calton for her "help"—apparently by providing assistance in New Jersey to obtain the necessary approvals to terminate plaintiff's employment.

Duffy's testimony he made the termination decision alone is also undermined by his May 10, 2017 email to Calton and Neybold, asking "Where are we with" plaintiff and stating he would be in Houston that week and wanted "to be able to deal with it." He asked them to "[l]et [him] know." This email supports the reasonable inference Duffy was awaiting input and approval to

42

terminate plaintiff from Calton, Neybold, and others in New Jersey. He sent the email to Neybold and Calton and asked where "[w]e are" concerning plaintiff's termination, suggesting their collective involvement in the decision-making process. Moreover, Calton understood the email as a request for the status of defendant's decision to terminate plaintiff's employment; she responded she had just spoken to Klug. The next day, Duffy terminated plaintiff's employment in Houston, with Calton participating over the telephone from New Jersey.

We do not offer an opinion on the resolution of the fact issues presented by this evidence, and we do not determine Duffy's version of the events—that he made the termination decision entirely on his own without input or approval from anyone in New Jersey—is not accurate. We determine only there are genuine issues of material fact essential to a proper analysis of the contacts the court was required to consider under section 145 of the Restatement (Second) in its choice-of-law analysis. A proper resolution of those fact issues could not properly be made on a summary judgment record. See R. 4:46-2(c).

The four contacts a court must consider under section 145 in determining which state has the most significant interest for choice-of-law purposes must be viewed "in terms of the guiding touchstones of . . . section 6," Fairfax, 450 N.J. Super. at 51, and the contacts "are to be evaluated according to their relative

43

importance with respect to the particular issue" presented by plaintiff's claims, ibid. (quoting Restatement (Second) at § 145). That analysis cannot be properly completed where, as here, there are extant fact issues as to one of the four contacts essential to the choice-of-law determination—the location where the cause of the injury occurred—under section 145.

In Calabotta, we considered whether the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to -50, applied to the wrongful discharge claim of an Illinois employee who was terminated in Illinois by his New Jersey employer. 460 N.J. Super. at 53. In our assessment of the pertinent factors under sections 145 and 6, we explained that although certain factors, including the place of injury, favored application of Illinois law, "if [the] plaintiff c [ould] establish that the company's decision to fire him was made or centered in New Jersey, that would be a counterweight on the New Jersey side of the scale." Id. at 73. We rejected the plaintiff's argument that "if the decision to terminate him was made by individuals physically located in New Jersey, that singular nexus must necessarily overcome all other factors that may weigh elsewhere," and explained "[t]he state where the decision was made . . . is simply one of many factors that in the overall mix in identifying the state having the most significant relationship to that claim." Ibid.

Plaintiff's arguments on appeal are, in great part, founded on the claim the decision to terminate her employment was made in New Jersey. She claims New Jersey law should apply because defendant's "New Jersey-based officials . . . orchestrated and/or made the determination to terminate" her employment. Conversely, defendant argues the decision to terminate plaintiff's employment was not made in New Jersey and therefore Texas law should apply because "[e]verything [i]n [t]his [c]ase [h]appened in Texas."

Based on the summary judgment record, the motion court could not properly resolve the factual dispute underlying the location of the conduct causing the harm—the decision-making process that resulted in the plaintiff's termination—that is an essential contact under section 145. See id. at 73 (finding a summary judgment on a choice-of-law determination based on the factors pertinent under the Restatement (Second) should not be made on a "disputed record"). Nor do we offer an opinion on its resolution or suggest an outcome. We determine only that it presents a genuine issue of material fact that precludes summary judgment based on a choice-of-law determination. See ibid.

Moreover, as to the fourth contact factor under section 145, the place where the relationship between the parties is centered, Restatement (Second) §

145, the court did not make any findings of fact "and correlate them to legal conclusions" as required by Rule 1:7-4(a). See Great Atl. & Pac. Tea. v. Checchio, 335 N.J. Super. 495, 498 (App. Div. 2000). The court was required to make such findings based on the summary judgment record in the first instance, and we need not make them in the motion court's stead even though we review the court's decision de novo. See Est. of Doerfler v. Fed. Ins. Co., 454 N.J. Super. 298, 302 (App. Div. 2018).

Additionally, and as we have explained, the proper assessment of the four contact factors in section 145 is essential to a determination of which state "has the most significant relationship to the occurrence and the parties under the principles stated in [section] 6" of the Restatement (Second). Calabotta, 460 N.J. Super. at 57. Under section 6, a court is required to consider the following non-exclusive factors when deciding which state's law applies:

> (a) the needs of the interstate and international systems,
>
> (b) the relevant policies of the forum,
>
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>
> (d) the protection of justified expectations,
>
> (e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

[Restatement (Second) § 6(2).]

The motion court mentioned the section 6 factors in its decision, but it did not address those factors or make findings of fact or conclusions of law as to them. See R. 1:7-4. Again, we opt not to address the merits of the factors under section 6 in the absence of findings of fact and conclusions of law from the motion court in the first instance, see Doerfler, 454 N.J. Super. at 302, and we are otherwise unable to make a choice-of-law determination under the Restatement (Second) because of the extant fact issue precluding a summary judgment determination of all the factors under section 145. Because we cannot properly resolve the choice-of-law issue presented on a disputed summary judgment record, Calabotta, 460 N.J. Super. at 73-74; see also D'Agostino v. Johnson & Johnson, Inc., 133 N.J. 516, 523, 545-46 (1993) (reversing a denial of a motion for summary judgment on a choice-of-law determination and remanding for resolution of fact issues pertinent to the determination under then-applicable "governmental-interest" standard for choice-of-law determinations), we remand for the motion court to do so in the first instance.

The court also granted defendant summary judgment on the alternative basis that plaintiff's CEPA claim fails as a matter of law because she lacks evidence establishing a causal connection between her alleged protected activity under CEPA and the termination of her employment. Plaintiff argues there are a myriad of factual issues that preclude summary judgment on the claim, and the motion court erred by finding otherwise.

To prove her CEPA claim, plaintiff was required to establish: (1) she reasonably believed defendants were violating a law, rule, or public policy; (2) that she engaged in protected activity under the statute; (3) an adverse employment action was taken against her; and (4) a causal relationship exists between the whistleblowing activity and the adverse employment action. See Dzwonar, 177 N.J. at 462. Defendant claimed, and the motion court agreed, plaintiff's CEPA claim failed because the evidence did not establish a causal connection between her alleged protected activity and her termination.

The court's analysis of the causal-connection issue was comprised of a brief summary of the parties' arguments, and a conclusory determination that the court did not "believe . . . giving plaintiff all the reasonable inferences[,] that [she] has been able to show that her complaints led to her termination and not her issues with management led to her termination." Again, the court did not

make any findings of fact and correlate the facts to its legal conclusion defendant is entitled to judgment on the merits of plaintiff's CEPA claim. See R. 1:7-4; Curtis, 83 N.J. at 569-70. The court's failure to provide findings of fact and conclusions of law as required under Rule 1:7-4(a) "constitutes a disservice to the litigants, the attorneys[,] and the appellate court." Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Curtis, 83 N.J. at 569-70).

It is not this court's role to make the findings of fact and conclusions of law necessary to address defendant's summary judgment motion, Doerfler, 454 N.J. Super. at 302, and we will not do so here because we otherwise remand for the court to address the fact issue we have identified, pertinent to the second contact factor under section 145 of the Restatement (Second), and the court on remand is otherwise required to address or make the required findings concerning the other pertinent factors under sections 6 and 145 of the Restatement (Second).[13] We therefore vacate the court's determination, as

_____

[13] Because the motion court did not address or make findings concerning the factors under section 6 and the second and fourth factors under section 145, we do not address whether there any genuine issues of material fact pertinent to a resolution of those issues and we leave that determination to the motion court based on the record and the arguments made by the parties. This opinion shall not be construed as expressing an opinion as to the existence of any fact issues concerning those issues. This opinion also shall not be construed as expressing an opinion on the merits of the parties' arguments concerning the factors

reflected in its summary judgment order, that plaintiff failed to present sufficient evidence establishing a causal connection between her alleged protected activity and the termination of her employment. On remand, the court shall consider the issue anew and support any decision it makes with the findings required under Rule 1:7-4(a).

We therefore vacate the court's summary judgment order and remand for the court to resolve the fact issue pertinent to a determination of the second contact factor under section 145 of the Restatement (Second), and to consider, address, and make findings under the fourth contact factor under section 145, and all the factors set forth in section 6. See generally Calabotta, 460 N.J. Super. 54-58 (explaining general principles applicable to choice-of-law determinations). The court's decision on the choice-of-law issues shall include findings of fact based on an analysis of the parties' Rule 4:46-2 statements, and conclusions of law based on a correlation of the facts to the applicable legal principles. R. 1:7-4(a); Curtis, 83 N.J. at 569-70. On remand, the court shall also consider defendant's summary judgment motion on the merits of the CEPA

---

pertinent to the choice of law determination or on which state's law should apply. For the same reasons, we do not express an opinion on defendant's claim the Court's opinion in D'Agostino controls the outcome of the choice-of-law issue; we could not properly decide or address that issue in the absence of adequate findings of fact and conclusions of law by the motion court.

claim, and the court shall support its decision with findings of fact and conclusions of law as required under Rule 1:7-4. The court shall afford the parties an opportunity for oral argument on remand, and otherwise employ such processes and proceedings as it deems appropriate. We offer no opinion on the merits of any remand issue.

Vacated and remanded for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION